# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

**BRIAN McNEAL**

**VERSUS**

**LOUISIANA DEPARTMENT
OF PUBLIC SAFETY &
CORRECTIONS,
JAMES LEBLANC, and
BREUNKIA COLLINS.**

**CIVIL ACTION**

**NO. 18-cv-00736-JWD-EWD**

## Second Amended Complaint

NOW INTO COURT, through counsel, comes Petitioner Brian McNeal to file this Second Amended Complaint pursuant to the leave to do so granted by the Court in R. Doc. 88:

1.      This is a case about Defendants' imprisonment of a man they knew should be free.

2.      According to black-letter law, jailors may not imprison inmates longer than their sentences. Recent Fifth Circuit precedent recognized that "There is a Clearly Established Right to Timely Release from Prison."[1]

3.      Once a prisoner's sentence has expired, his jailor has a reasonable amount of time to process and release him. Courts have repeatedly held that the phrase "reasonable time" means some amount of time less than 48 hours. [2] In other words, an inmate who has already served his court-ordered sentence must be released within a reasonable time not to exceed two days. A minute more is unconstitutional and illegal.

---

[1] *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (emphasis in the original).

[2] *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011) ("In recognition of these facts, courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin.*"). That is because once a detainee is ordered released, the public's interest in his prompt release is even greater, and the constitutional tolerance for "administrative delay" is substantially less than in the context of arrestees awaiting probable cause determinations – which must come within 48 hours. *See Berry v. Baca*, 379 F.3d 764, 771-72 (9th Cir. 2004); *Powell v. Barrett*, 376 F.Supp.2d 1340, 1353 (N.D.Ga. 2005),

4.      A jury is often asked to decide whether an overdetention of *less* than 48 hours is constitutional,[3] and juries have found that delay of as little as thirty minutes is unconstitutional.[4] But courts across the country have held, unequivocally, that a detention *beyond* 48 hours of an inmate's known sentence is unreasonable and illegal. Indeed, "[t]he court has been unable to find **any case**, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible."[5]

5.      Petitioner Brian McNeal should have been a free man on November 1, 2017. Staff at the DOC knew this, because they issued him a release letter for that date.

6.      But they did not set him free on November 1, 2017.

7.      Nor did they set him free on December 6, 2017, when a DOC employee discovered that Brian McNeal had been overdetained.

8.      Instead, they held him in prison until December 12, 2017 – despite the repeated entreaties of Brian, his girlfriend, and his lawyer.

9.      Unfortunately, Brian's experience of being held past his release date is neither unique nor even unusual in Louisiana – and the DOC knows it. The day before Brian was incarcerated, the Louisiana Legislative Auditor released a report finding that the DOC had a serious problem of not knowing where its inmates were located, or when their proper release date was.

10.     And five years prior, Secretary LeBlanc had overseen an internal investigation that found more than two thousand inmates per year were being held past their release date.

---

[3] *Berry v. Baca*, 379 F.3d 764, 77072 (9th Cir.2004) (twenty-nine hour delay presented question for jury); *Arline v. City of Jacksonville*, 359 F.Supp.2d 1300, 1310 (M.D.Fla.2005) (two and a half hour delay presented jury question).
[4] *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004).
[5] *Powell v. Barrett*, 376 F.Supp.2d 1340, 1354 (N.D.Ga. 2005) (bolded emphasis added).

2

11.    This was true specifically for inmates similarly situated to Mr. McNeal. According to DOC data, approximately two dozen inmates per *month* are held for five to seven days past the point at which they were identified as overdetained, just like Mr. McNeal.

12.    The DOC's own counsel has admitted the pattern of overdetention. On March 8, 2018, Attorney General Jeff Landry wrote an op-ed conceding that there **"is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."[6]**

13.    This cannot be allowed to continue. Brian McNeal files this lawsuit to hold the DOC accountable for their practice of imprisoning men and women that should be free.

**Plaintiff**:

14.    Plaintiff <u>Brian McNeal</u> is a person of the full age of majority maintaining a residence in New Orleans, LA. Upon information and belief he respectfully represents the facts and causes of action pled herein against the Defendants.

**Defendants**:

15.    <u>Louisiana Department of Public Safety & Corrections</u> ("DOC") is an arm of the State of Louisiana.

16.    <u>James LeBlanc</u> is the Secretary for the Louisiana Department of Public Safety & Corrections and a final policymaker. He is sued in his individual and official capacities.

17.    <u>Breunkia Collins</u> is a DOC employee who was involved with ensuring Brian's proper release. She is sued in her individual capacity.

**Jurisdiction and Venue**

18.    Jurisdiction is proper in this Court This Court has jurisdiction over Plaintiff's claims of federal rights violations, enforceable under the Fourteenth Amendment and 42 U.S.C.

---

[6] Sen. John Kennedy and Atty. Gen. Jeff Landry, *Criminal justice reform actually hurting public safety*, The Advocate (Mar. 8, 2018) (emphasis added).

§ 1983, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3). This Court has jurisdiction over Plaintiff's

state law claims in accordance with 28 U.S.C. § 1367. Jurisdiction is proper in this Court also

because Defendants removed the case from state court.

19.    Venue is proper in this Court because a substantial part of the events giving rise to

the claim occurred in this district, and because Defendants removed the case from state court.

## Background and Facts

**A.    Brian McNeal was held for 41 days past his court-ordered release date.**

20.    On October 26, 2015, Brian McNeal plead guilty to possession of cocaine and

drug paraphernalia in Orleans Criminal District Court. (Case No. 524-699.) He was sentenced to

a five-year suspended sentence, with five years of active probation.

21.    On July 26, 2017, Brian was rearrested and incarcerated, and a rule to show cause

was set regarding potential violation of probation.

22.    On August 3, 2017, the judge ordered that: "THE DEFENDANT'S PROBATION

BE REVOKE UNDER THE PROVISIONS OF ACT 402 AND THAT THE 90 DAY

SENTENCE BE SERVED AT THE STEVE HOYLE PROGRAM." (The Steve Hoyle Program

is an in-patient substance abuse program at the Bossier Parish Correctional Center in Plain

Dealing, Louisiana.)

23.    On August 8, 2017, pursuant to the judge's order, the Department of Public

Safety & Corrections ("DOC") issued a Release Letter for Brian McNeal with a November 1,

2017 release date. (90 days from the August 3 sentence.)

24.    On August 22, 2017, the DOC via Breunkia Collins sent a release letter to the

Steve Hoyle program, directing them to release McNeal on November 1, 2017.

25.    Also on August 22, 2017, the DOC sent a request to the Orleans Parish Sheriff,

directing them to bring Mr. McNeal to the DOC's Elayn Hunt Correctional Center ("Hunt"), near

Baton Rouge

26.     On August 29, 2017, McNeal was transferred from the Orleans Parish Prison to the DOC's Elayn Hunt Correctional Center ("Hunt"), near Baton Rouge.

27.     Brian was not, however, sent thereafter to the Steve Hoyle Program as the judge ordered. Medical staff at Hunt determined that Mr. McNeal had a mental impairment that disqualified him from the program, and so he continued to be incarcerated at the Hunt Reception and Diagnostic Center ("HRDC").

28.     The HRDC is a facility within Hunt that acts as a "waiting room" – inmates are held there while they are assessed, classified, and then sent on to another facility.

29.     Because it is supposed to be briefly temporary for any given inmate, HRDC has few of the programs that are available at other facilities. For example, it has no sports, hobbycraft, classes, drug addition programs, *etc.*

30.     Thus, at this point, *McNeal's release letter* had been sent to the Steve Hoyle program in Bossier Parish; but *McNeal physically* was being kept at Hunt prison.

31.     Ms. Collins specifically knew this to be so: she personally sent the release letter to Steve Hoyle, and she also noted that same day in a separate email that Mr. McNeal was "Detained in Orleans."

32.     Neither Ms. Collins nor any other Defendant took any steps to ensure that Mr. McNeal's release letter wound up at the facility he was actually at.

33.     On September 21, 2017, a DOC administrative coordinator wrote a letter to the Orleans Parish Clerk of Court asking for the Bill of Information and sentencing minutes, for the purpose of calculating Brian's release date.

34.     As of September 27, 2017, Brian McNeal's entry in CAJUN showed no release date. Handwritten notes on a print out of his Sept. 27 CAJUN entry show DOC employee Robin Milligan's handwritten notes telling someone to ask for revocation minutes.

35.    In the days leading up to Brian's legal, November 1 release date, Brian spoke to a female deputy at Hunt about the fact that he should be going free on Nov. 1.

36.    On November 1, 2017, Brian was not released as legally required.

37.    His girlfriend Crystal began making phone calls to find out why Brian hadn't been released. She called the automated inmate information phone line, which gave no release date but said that Brian was under supervision of parole office. Crystal called the New Orleans parole office and told them that Brian was scheduled to be released but hadn't been. The parole office told her to call the automated phone line. Crystal called the automated phone line back, which provided no new information, so she called the parole office back. The parole office told her that they couldn't help her.

38.    On November 15, 2017, Brian wrote a letter to the warden of Hunt, explaining that he hadn't been taken to court and hadn't been released as he was supposed to.

39.    On November 16, 2017, the warden's office wrote back to Brian: "If your presence was required in court, the proper documents would have been sent for you to be transported." Brian was not released.

40.    Later, Brian spoke with a major at Hunt about how he was supposed to be released. Brian was not released.

41.    On December 6, 2017, Crystal went to the courthouse. She spoke with Brian's probation officer, Peter Pobocik. She told him that Brian was supposed to be released more than a month ago. Peter said he'd look into it. Crystal also spoke with Brian's lawyer, Stas Moroz of the Orleans Public Defender's Office.

42.    Peter Pobocik looked Brian up in his system and saw that Brian was supposed to have been released. He informed his supervisor, Toby Lamy.

43.    On December 7, 2017, Peter Pobocik called Crystal back and confirmed that Brian should have been released on November 1, 2017.

44.     On December 8, 2017, the New Orleans Probation and Parole office notified DOC headquarters that Brian should be free.

45.     On December 11, 2017, Brian's lawyer Stas Moroz sent an email to Agent Lassalle at Probation & Parole about Brian's overdetention.  Mr. Moroz also talked to Stacy Brooks at Court Intervention Services, the records department at Hunt, and Judge Herman. The records department at Hunt said they'd look into it and to call Mr. Moroz back, but they did not call Mr. Moroz back.

46.     At 11:28 a.m. on Dec. 11, 2017, Jennifer Bush at DOC headquarters emailed a release letter to Hunt. It said "This is your authority to release the offender on 11/01/2017, as having completed said sentence that was imposed at the time of revocation." She explained that Brian "was thought to be at a different facility."

47.     At 11:32 a.m. on Dec. 11, 2017, Brian McNeal's CAJUN entry was updated to show a Nov. 1, 2017 release date.

48.     Staff members at Hunt checked with the Jefferson Parish Sheriff's Office about whether Brian had any outstanding attachments.

49.     At 4:19 p.m. on December 11, 2017, the Jefferson Parish Sheriff's Office responded to Hunt via fax that an attachment was still outstanding but that "we would not extradite, subject would get an ROR when released."

50.     On December 12, 2017, Brian's lawyer Stas Moroz called the warden's office at Hunt to see why Brian still hadn't been released. He spoke with Debbie and Tanisha White in that office. They said it "wasn't their fault" and blamed probation and parole. Later that day, they called Mr. Moroz back and told him that Brian would be released.

51.     Later on December 12, 2017, Brian was finally released from custody, 41 days after his legal release date.

**B.    In 2012, Secretary LeBlanc discovered that the Department of Corrections was holding thousands of inmates past their release dates each year.**

52.    Louisiana has historically ranked as the state with the highest incarceration rate.

53.    The DOC manages approximately 33,000 persons in its custody.

54.    In 2012, the DOC had a team of a dozen of its staff perform a "Lean Six Sigma"[7] review of its inmate time calculation processes.

55.    Secretary LeBlanc was a "champion" of the project.

56.    The Lean Six Sigma review found a widespread pattern of people being held past their legal release date. Specifically, it found that when the DOC calculated the release date of inmates, 83% were eligible for "immediate release . . . due to an earlier release date."

57.  By the DOC's own admission, this 83% of inmates were all being "overdetained."

58.  The DOC's representative testified that:

**Q.**    I use the word "overdetention" to describe someone who should have been released in the past but wasn't. Will you understand me if I use that term?

**A.**    Yes.

**Q.**    So these people who were found to have an earlier release date, they were being overdetained, right?

**A.**    By your definition of overdetention, yes.

**Q.**    So this [Six Sigma] investigation found that 83.44 percent of these cases, once their time was computed, were found to have been overdetained, correct?

**A.**    By your definition, yes.

59.    How widespread was this problem? The DOC Six Sigma review found that it was overdetaining **2,252 inmates per year**, with an average of **71.69 "Overdue days" per inmate**.

---

[7] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, _Lean Six Sigma_, Investopedia.com (Feb. 5, 2018).

60.    The DOC concedes that these inmates were being held past their "legal release date." In a deposition, the DOC's representative testifed:

> Q.    So in 2012, the DOC's Six Sigma
> investigation found an average of 2,252 cases of
> immediate release per year with an average of 71.7
> overdue days per case; is that right?
>     A.    Yes.
>     Q.    This is inmates being held past their
> legal release date, correct?
>     A.    Yes.

61. But despite being alerted to this problem, Secretary LeBlanc did not fix it.

62. Nor did Secretary LeBlanc did not even set a *goal* of fixing the problem.

63. The goal the Secretary LeBlanc set for the DOC as part of the Six Sigma process was to overdetain <u>only</u> 450 persons per year, for an average of 31 days per person.

64. The Six Sigma team estimated that if it could hit that goal, it would save the state $3.7 million dollars per year.

65. Because Secretary LeBlanc did not set a goal of completely fixing the problem, the DOC did not try.

66. The DOC implemented interventions that "modestly improved", but did not eliminate the problem.

67.    After the DOC Six Sigma team's modest interventions, the number of these overdetained persons was reduced from 2,252 per year to 1,612, and the average number of overdue days was reduced from 71.7 to 60.52 days – still a major constitutional violation.

68.    The DOC did take some steps to try to improve things after that. They centralized their PreClass department, and made "some adjustment and updates to the Uniform Commitment Order."

69.     In 2015 the DOC tried out a new electronic record management system for a short period and found it to be inoperable. It then went back to its old 1990s era CAJUN system.

70.     As a result, the "functional processes" around the transmission of documents "remain as antiquated as they were in 1996."

71.     And so the "DOC today is using the same technology for managing inmates that they used in '96" – twenty-four years ago.

72.     Secretary LeBlanc concedes that "the CAJUN System is obviously antiquated" and "some documents are driven by van from the sheriffs to the Department of Corrections."

73.     In 2015, multiple DOC employees testified to a well-documented pattern of overdetention. In *Chowns v. LeBlanc*, La. 37th JDC 26-932, the following testimony was elicited:

   a.  Tracy Dibenetto, a DOC employee, testified that DOC staff  have discovered approximately <u>one case of overdetention per week for the last nine years</u>. Ms. Dibenetto also testified that inmates are sometimes incorrectly incarcerated for periods of up to a year.

   b.  Henry Goines, a DOC employee whose job was to review sentence computations for the assistant secretary, testified that he typically discovered "one or two [inmates] a week" who were eligible for immediate release.

   c.  Cheryl Schexnayder, a DOC records analyst, testified that in the course of her job, she had looked at inmates' sentences and found that they had been done wrong and the inmate was entitled to immediate release.

74.     Sonja Riddick, a DOC employee, responded to the question: "Did you ever find a time when you looked at an inmate's records and you say, this man should be out now?" with the answer: "<u>Oh yes</u>."

75.     The DOC wound up settling with Mr. Chowns for more than $100,000.

76.     But instead of trying to <u>find a solution</u>, under Secretary LeBlanc the DOC took steps to try to try to <u>stop people from complaining</u>.

77.  For example, on its website the DOC posted a statement: "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department

10

has to receive official paperwork from the sentencing court in order to calculate the offender's release date."

78.  Secretary LeBlanc admits that the "12 weeks is ridiculous" and "just absurd."

79.  Similarly, the DOC put on its voicemail an audio statement that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve.

80.  The DOC admits that it posted these statements online and on voicemail to reduce the number of calls from members of the public complaining about why a family member was still being held in prison past their release date.

81.  As a result, the overdetention problem continued, year after year.

82.  For five years after the Six Sigma report, the DOC did not even provide a training program for DOC time computation staff.

83.  According to the DOC, "[P]rior to 2017, there was no formal training program for time computation. It was *ad hoc* people working with their supervisors and learning as they go."

84.  Each year, thousands of people were held in DOC custody longer than their court-ordered sentences.

**C.    In 2017, the year of Brian McNeal's overdetention, the DOC confirmed that "an average of 200 inmates per month [are] held an average of 49 days past the end of their sentence."**

85.  In October 2017, the Louisiana Legislative Auditor released a report detailing an audit it had conducted into the DOC, entitled "Management of Offender Data: Processes for Ensuring Accuracy."

86.  The Legislative Auditor found a number of problems, including basic data errors at a rate of 26 errors per 100 inmates.

87.  Compounding this, the Auditor found that the "DOC's process for calculating offender release dates is inconsistent, which can result in errors."

88.  As a result, the Auditor found that "an offender could be held too long if the release

11

date was miscalculated and not caught until shortly before release."

89.   For example, the Auditor "asked two DOC staff to calculate release dates on the same offender, and each staff used a different method to calculate the release date. The two results differed by 186 days."

90.  That same year, 2017, the DOC did its own internal investigation and confirmed that the pattern of overdetention it learned about in 2012 was ongoing.

91.  In a grant application to the U.S. Department of Justice, the Louisiana DOC disclosed that in 2017, it "had an average of **200 cases per month** considered an 'immediate release' due to these deficiencies."

92.  According to the DOC, these people were held an "average of 49 days past the end of their sentences."[8]

93.  The DOC concluded that this pattern of overdetention was costing the state "$2.8M per year in housing costs alone."

94.  According to the DOC, this is "taxpayer money" that the "DOC should not have to spend."

**D.    The overdetention problem continues. According to the most recent data, 231 people per month wait an "average 44 days to be released after a judge ordered them free."**

95.    The DOC's pattern of overdetention was widely known and broadly admitted. On March 8, 2018, Defendants' counsel Attorney General Jeff Landry wrote an op-ed conceding that there "is a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."

96.    Similarly, DOC spokesperson Ken Pastorick said of the overdetention problem:

---

[8] The DOC's representative testified that "Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes."

"We know that there is an issue here and we want to solve it."

97.     But despite "want[ing] to solve it," the DOC has not taken real steps to solve it.

98.     And so the problem continues. The most recent large-scale data the DOC has released is from February 2019.

99.     In that month, according of general counsel for the Department of Corrections, "231 people across the state were affected. Those people waited an average 44 days to be released after a judge ordered them free."

100.     The problem is so severe that in 2020, the U.S. Department of Justice opened a pattern-and-practice investigation into the Louisiana DOC's practice of holding persons beyond their release date.

**E.     Secretary LeBlanc Personally Knew of the "Big Problem" of Overdetention.**

101.     Defendant James LeBlanc has been Secretary of the Department of Public Safety & Corrections since 2008.

102.     As Secretary, he is "responsible for the inmates sentenced to the custody of the DOC," whether or not they are in "a state-run facility, a parish-run facility, or private-facility."

103.     Prior to 2012, Secretary LeBlanc says that he did not know about a problem of overdetention.

104.     Then, in 2012, he was one of the three "champions" of the 2012 Lean Six Sigma project.

105.     It was "through that Six Sigma Process that [Secretary LeBlanc] learned there was a problem with people being held past their release dates."[9]

106.     Specifically, he testified that:

---

[9] Ex. H at 33.

```
Q.   But you learned that thousands of people in
     the custody of the Department of
     Corrections for whatever reason were being
     held past their release date, correct?
A.   I did.
```

107.    And after the post-Six Sigma interventions, Secretary LeBlanc testified that he understood that the DOC still had "people being held an average of about two months past their release date."

108.    Secretary LeBlanc agreed this was "a big problem."

109.    And yet all this, he did not initiate a single example of "discipline or adverse employment activity for DOC employees who have incorrectly computed sentences or release dates, from 2000 to the present."

**F.    After learning of the huge pattern of overdetention, Secretary LeBlanc refused to make timely release a DOC priority or a DOC practice.**

110.    In his actions and inactions, Secretary LeBlanc has consistently made clear that ensuring that inmates are timely released is not a priority.

111.    For example, in 2012 the Six Sigma report found documents waited at the DOC to be calculated for an average of 79 days.

112.    But instead of fixing that, under Secretary LeBlanc the DOC simply adopted the delay as its standard practice.

113.    As described above, a three to four month delay was incorporated into the DOC's website and voicemail.

114.    Similarly, although he found out that thousands of inmates were being overdetained each year, Secretary LeBlanc did not fire anyone because of inmates being held past their release date.

115.    Secretary LeBlanc did not demote anyone because of inmates being held past their release date.

116.    Secretary LeBlanc did not dock any employee's pay because of inmates being held past their release date.

117.    Secretary LeBlanc did not even *reprimand* anyone because of inmates being held past their release date.

118.    Nor did Secretary LeBlanc ever add a goal of solving or mitigating the overdetention problem to the DOC's strategic plan, in any year from 2012 to the present.

119.    He did, however, set goals of keeping the prisons **full**. In one strategic plan, he set the goal of "Maintain the adult offender institution population at a minimum of 99% of design capacity through 2019."

120.    So the problem continued, although Secretary LeBlanc was periodically reminded of it by judges, state legislators, litigants, and his own staff.

121.    On January 20, 2015, Judge Doggett of the 9th JDC wrote an email that was forwarded to Secretary LeBlanc. Judge Doggett complained that an inmate had been held past his release date by nearly two months, "in spite of several phone calls from Judge Randow for his release."

122.    Also in 2015, LeBlanc was sued in a case entitled *Chowns v. LeBlanc* for overdetention. The case settled for $120,000.

123.    On January 28, 2016, a state legislator's office reached out to Secretary LeBlanc about an inmate who had obtained "an order of immediate release" more than two weeks prior, and was "still being detained and has been given no explanation of the delay."[10]

124.    On October 7, 2016, LeBlanc wrote a letter to the Clerk of Courts Association

---

[10] *Id.* at 10.

saying that "delayed paperwork" resulted in "immediate releases of offenders who may have been eligible for an earlier relase date, increasing incarceration costs. **We have found that in these cases, an offender may serve an average of 40 additional days incarcerated**."

125.     He testified that in 2017, it was "costing the state $239,022 per month" to hold "people who should be out."

126.     And so Secretary LeBlanc admits that five years after the Six Sigma project, overdetention was still "a problem."

127.     Also in 2017, Secretary LeBlanc was personally involved in the "the back-and-forth with the auditor" which led to the Louisiana Legislative -Auditor's report.

128.     As of 2019, Secretary LeBlanc testified that there was still an overdetention problem.

129.     And yet despite being aware of the problem and being periodically reminded of it, Secretary LeBlanc has refused to try even simple solutions to mitigate overdetention.

130.     For example, the Louisiana Legislative Auditor suggested a that the DOC adopt a policy to impose a deadline on sheriffs to submit pre-classification packets to the DOC.

131.     Secretary LeBlanc failed to adopt that proposal, despite his own admission that "there's no reason why [the DOC] couldn't" adopt such a policy and that he is "not sure why we don't, to be honest," and "we could certainly, at least, make an attempt."

132.     Similarly, the executive director of the Louisiana Clerks of Court Association, Debbie Hudnall, had a series of meetings with the DOC and Secretary LeBlanc.

133.     Ms. Hudnall offered that to speed things up, the Clerks of Court could begin emailing documents to the DOC.[11] Secretary LeBlanc declined, claiming that his department did not "have the capability of receiving that."

---

[11] Testimony of Debbie Hudnall, Louisiana House of Representatives, Judiciary Committee, Jan. 15, 2020, at 1:03:35. Available online at
http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2019/dec/1212_19_JU

134. And although Secretary LeBlanc does not know of "any other state that has the magnitude of an issue with people being held past their release dates that Louisiana has," he has not, however, talked to the heads of other states' department of corrections about how they prevent overdetention, aside from looking at what software they use.

135. If he did, he would have learned how they prevent overdetention.

136. For example, by the late 1990s a single county in California – Los Angeles County – had a larger volume of inmates to process than the Louisiana did in the 2010s, but processed them more than an order of magnitude faster than the Louisiana DOC.

137. This is described in *Brass v. County of Los Angeles*, 328 F. 3d 1192 (9th Cir. 2003) (citations omitted), and shows that Secretary LeBlanc's problems were not in any way insurmountable:

> The Inmate Reception Center of the Los Angeles County Sheriff's Department ("Sheriff's Department") processes all inmate entrances and releases for the County. The Sheriff's Custody Division operates the jails, and books and releases close to 600 inmates per day, an average of more than 200,000 inmates annually. Many inmates in the County jail system are repeat and/or serious offenders. Law enforcement and other government agencies frequently ask the Inmate Reception Center to place "holds" on a particular inmate's release. Upon receipt, these holds are processed and put into the jail computer system. The system is updated continually, with the largest amount of information from the courts arriving at the end of the day.
>
> The Inmate Reception Center receives from the forty-two courts in the County 3,000 to 5,000 documents daily. Each document is read individually, routed and entered into the computer system; approximately seventy clerks work day and night on this task. Before releasing an inmate, the Sheriff's Department makes a record check that includes a review of all "wants" and "holds" received on a prisoner's scheduled release date. . . . **It generally takes from twenty-four to forty-eight hours to process an inmate's release.**

138. Contrast that with the DOC's statement under Secretary LeBlanc's that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve.

139. Secretary LeBlanc could have made timely inmate release the priority, goal, and policy of the DOC.

140.    But in the five years from 2012 to Mr. McNeal's overdetention in 2017, Secretary LeBlanc chose not to do so.

141.    By contrast, when it comes to DOC employee pay, Secretary LeBlanc ensured that time *was* tracked carefully and accurately.

142.    For example, for its employee retirement benefit system, the State has to "has to keep careful track of how long DOC employees have worked, what their salary was, and other factors so that the state can calculate what sort of benefits they're eligible for upon retirement."

143.    And in that context, to the DOC's knowledge, there are no complaints.

144.    That is because "the State is capable of keeping track of a lot of people's questions about their time, applying formulas, doing it in an accurate and orderly fashion."

145.    Secretary LeBlanc has chosen not to apply that same competence to timely inmate release.

## G.    The DOC has a pattern of overdetaining inmates nearly a week after they have been identified as overdetained, just like Brian McNeal.

146.    As described above, a DOC employee discovered at least as early as December 6, 2017, that Brian McNeal was being held beyond the end of his sentence.

147.    But Brian McNeal was not quickly released after he was identified as overdetained.

148.    He was released on December 12, 2017, six days after the DOC employee had identified him as overdetained.

149.    This is a very common occurrence in Louisiana.

150.    By failing to even set a *goal* of fixing overdetention, Secretary LeBlanc made clear that timely release was not a priority of the department.

18

151.    And by failing to fire, dock pay, suspend, or even reprimand a single employee for overdetention, Secretary LeBlanc made clear that there would be no consequences for an employee for not quickly releasing an overdetained inmate.

152.    Secretary LeBlanc clearly communicated that an inmate being overdetained was not an urgent matter, and did not need to be immediately addressed.

153.    As a result, once a DOC inmate is identified as being overdetained, they are released – but not quickly.

154.    According to the most recent data, approximately **two dozen people per month** are held for about the same period of time as Brian McNeal after being identified as overdetained.

155.    The February 2019 Pull Document is a snapshot of data from one month. It shows 231 persons held past their release date.

156.    Approximately two dozen of them were held for similar lengths of time as Brian McNeal, even after they had been identified as overdetained.

157.    Specifically, in that one month the following persons were held between five and seven days even after they had been found to be overdetained:

158.    Woodrow Gibson, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

159.    Aubrey Blue, who was imprisoned for six days even after her time had been calculated and she had been found to be overdetained.

160.    Levy Flowers, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

161.    Ashley Pleasant, who was imprisoned for five days even after her time had been calculated and she had been found to be overdetained.

162.    Zachary Carroll, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

163.    Matthew Roberts, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

164.    David Vargas, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

165.    Kobie Prosha, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

166.    Jamison Hammete, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

167.    Antonio Carpenter, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

168.    Chad Tidwell, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

169.    Kenneth Sikes, who was imprisoned for seven days even after his time had been calculated and he had been found to be overdetained.

170.    April King, who was imprisoned for six days even after her time had been calculated and she had been found to be overdetained.

171.    Paul Jones, who was imprisoned for seven days even after his time had been calculated and he had been found to be overdetained.

172.    Jason Balfantz, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

173.    Tyrone Singleton, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

174.    Alex Mitchell, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

175.    Joshua Lewis, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

176.    Blane Landry, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

177.    DeQuez Gray, who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

178.    Raymond Charles , who was imprisoned for six days even after his time had been calculated and he had been found to be overdetained.

179.    Princeton Vallo, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

180.    Eric Etheredge, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

181.    Horace Dugan, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

182.    Robert Washington, who was imprisoned for five days even after his time had been calculated and he had been found to be overdetained.

183.    After finding no remedy elsewhere, Petitioner has initiated this action in order to recover their damages.

### CAUSES OF ACTION

184.    Petitioners assert the following Causes of Action, plead in the alternative where appropriate, against the Defendants.

**Count 1 – False Imprisonment** (Against DPS&C and LeBlanc Only)

185.    "The civil cause of action for false imprisonment requires proof of restraint without color of legal authority. . . There is no requirement of proving that the confinement be intentional." *Prisk v. Palazzo,* 668 So.2d 415, 417(La. App. 4 Cir. 1996) (citations omitted.). A custodian's obligation is to see that the sentence imposed is the sentence served. *State ex rel. Pierre v. Maggio*, 445 So.2d 425, 426 (La.1984); *State v. Criminal Dist. Court Parish of Orleans*, 433 So. 2d 712 (La. 1983).

186.    On November 1, 2017, the legal authority to detain Brian expired.

187.    Defendants had possession of a release letter for Brian with the release date of November 1, 2017.

188.    Defendants, however, imprisoned Brian until December 12, 2017.

189.    Defendants thus falsely imprisoned Brian when they unlawfully held him past his release date.

### Count 2 – Negligence (All Defendants)

190.    Due to their professional roles as jailors, Defendants owed duties to avoid overdetention to the persons in their custody, including Brian. *Chowns v. LeBlanc*, La. 37th JDC 26-932 ("The defendants represent the State of Louisiana. It was their job and responsibility to accurately determine this defendant's, or any person's, correct release date. They have a duty to timely release the defendant."); *Porter v. Epps,* 659 F. 3d 440, 445 (5th Cir. 2011) (a jailor has "not only the duty to protect a prisoner, but also the duty to effect his timely release.")

191.    Defendants had a duty to ensure that Mr. McNeal's release letter wound up in the facility he was actually held in.

192.    These duties were breached by Defendants' acts and omissions, including the failure to timely release Brian even after repeated inquiries by Brian, Crystal, and Mr. Moroz. *See Chowns v. LeBlanc*, La. 37th JDC 26-932 ("DOC does have a duty to Mr. Chowns, and they have breached that duty".)

193.    Defendants' acts and omissions were the cause in fact of Brian's harm because they resulted in his illegal incarceration for 41 days.

194.    As a result of Defendants' acts and omissions, Brian suffered actual, forseeable harm.

## Count 3 - Violation of the U.S. Constitution (Against LeBlanc Only)

195.    The Fourteenth Amendment Due Process Clause is violated where a prisoner remains incarcerated after the legal authority to hold him has expired. *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980). No privilege enables a jailer to detain a prisoner beyond the period of his lawful sentence. *Whirl v. Kern,* 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N. D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

196.    Brian McNeal's 14th Amendment rights were violated when he was held for 41 days after the legal authority to hold him had expired. As Defendants were acting under the color of state law, Plaintiff's claims are actionable under 42 U.S.C. § 1983.

197.    Brian McNeal was even held for six days past the point at which a DOC employee had identified him as overdetained.

## Count 4 - Violation of the Louisiana Constitution
### (Against DPS&C and LeBlanc Only)

198.    Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

199.    By reason of the same conduct that violated Brian's federal constitutional rights, Defendants violated his state constitutional rights to liberty and due process.

200.    This conduct resulted in Brian's overdetention and caused the physical, emotional and pecuniary damages as described above and below.

**Count 5 - *Monell* and Failure to Train/Supervise** (LeBlanc Only)

201.    The misconduct described above was caused by the policies, practices, and customs of Defendants, in that their employees and agents regularly overdetain persons who are subject to release.

202.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the Defendants, were allowed to exist because policymakers with authority over these acts exhibited deliberate indifference to the problem, thereby effectively ratifying it.

203.    The policies, practices, and customs set forth above were the driving force behind the numerous constitutional violations in this case that directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

204.    Furthermore, the widespread practices described in the preceding paragraphs were allowed to flourish because Defendants declined to implement sufficient training, sufficient policies, or any legitimate mechanism for oversight or punishment of officers and agents.

205.    This is because Secretary LeBlanc has failed to make it a priority to timely release inmates.

206.    In 2012, he was aware of the facts indicating that a serious risk of continued overdetention would continue if he did nothing.

207.    He also subjectively drew the inference that it was a "big problem" that needed to be solved.

208.    But LeBlanc took no steps to fix the problem.

209.    He did not fire, discipline, dock pay, or even *reprimand* a single DOC employee for any instance of overdetention.

210.    He did not implement *any* formal training for the relevant staff until 2017, five years after he was alerted to the problem.

24

211.    He did not set a goal of solving overdetention, or incorporate it into the DOC's strategic plan in any year.

212.    Instead, his department took steps to reduce the number of complaints about overdetention, not reduce the number of inmates overdetained.

213.    LeBlanc's message to his department was clear: timely release is not a priority, and failing to timely release an inmate will not be punished.

214.    And so predictably, inmates continued to be overdetained, just like Mr. McNeal.

215.    Brian McNeal was held for 41 days after the legal authority to hold him had expired.

216.    And Brian McNeal was even held for 6 days past the point at which a DOC employee had identified him as overdetained.

217.    Although some elements of his fact pattern are perhaps unusual, what happened to Brian McNeal after he was identified as being overdetained is extremely common under Secretary LeBlanc's leadership.

218.    Approximately two dozen inmates per month are held for 5 to 7 days past the point at which they are identified as being overdetained. *See, e.g.,* ¶¶ 159 to 183, *supra*.

219.    Secretary LeBlanc's failure to train and supervise his subordinates is the direct cause of Brian McNeal being held for 41 days after the legal authority to hold him had expired.

220.    According to the DOC, "prior to 2017, there was no formal training program for time computation. It was *ad hoc* people working with their supervisors and learning as they go."

221.    By 2012, Secretary LeBlanc learned that this *ad hoc* approach was resulting in the overdetention of thousands of inmates.

222.    As a result, it was obvious that continuing the *ad hoc* approach for another five years would result in further constitutional violations.

25

223.    Likewise, Secretary LeBlanc's failure to train and supervise his subordinates is the direct cause of Brian McNeal being held for 6 days even after he was identified as being overdetained.

224.    The complete lack of any sort of punishment for any employee for ever causing an inmate's overdetention led to a climate in which timely release was neither a priority nor even a basic expectation.

225.    Simply not taking the steps to fix the DOC's overdetention problem would be bad, and a constitutional violation.

226.    But Secretary LeBlanc went further.

227.    He refused help from groups like the Louisiana Clerks of Court Association.

228.    He refused to implement simple solutions like the ones suggested by the Louisiana Legislative Auditor, even when he admitted "there's no reason why [the DOC] couldn't" do so.

229.    He did not ask how other states avoided overdetention, other than to ask what computer system they used.

230.    He did not even set a *goal* of solving the overdetention problem, even though he knew it would save the state millions of dollars per year.

231.    And in refusing help, refusing to adopt simple solutions, not looking to other states, and refusing to set goals, Secretary LeBlanc exhibited a reckless or callous indifference to the constitutional rights of the inmates in his care.

232.    Indeed, in *Crittindon v. Gusman*, 17-cv-00512-SDD-EWD, R. Doc. 168 (M.D. La., Apr. 13, 2020), this Court held that "The state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, **evinces a reckless disregard** for the likelihood of overdetention in the DOC system."

26

**Count 6 – *Respondeat Superior* (DPS&C Only)**

233.    While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the DPS&C within the scope of their employment.

234.    The DPS&C is therefore liable as principals for all torts committed by its agents.

**Count 7 – Indemnification (DPS&C Only)**

235.    Louisiana law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for actions taken in the discharge of their duties that are within the scope of their employment activities.

236.    While committing the misconduct alleged in the preceding paragraphs, some Defendants and others were employees, members, and agents of the DPS&C within the scope of their employment.

237.    The DPS&C is therefore obligated by Louisiana statute to pay any judgment entered against its employees.

**Remedies**

238.    Because of the above plead causes of action, Petitioner seeks the following:

A.  Declaratory relief;

B.  Compensatory damages;

C.  Punitive damages under 42 U.S.C. § 1983;

D.  Legal costs and attorneys fees;

E.  Other and further relief, at law or in equity (but not injunctive relief), to which Plaintiff may be justly entitled.

239.    Petitioner states any and all other causes of action may become known through a trial of this matter on its merits against any and all other parties which are herein named or which

may be added later, and request any and all other damages or remedies which this court may deem equitable.

240.    Petitioner reserves the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

241.    An amicable demand has been made on all Defendants.

WHEREFORE, Petitioners pray that there be judgment in favor of Petitioners and against Defendants, jointly and *in solido* for the full amount of Petitioners' damages, plus legal interest together with all costs incurred in this matter, and any other general or equitable relief that the court deems proper.

Respectfully Submitted,


/s/ William Most_
William Most, Bar No. 36914
David Lanser, Bar No. 37764
Hope Phelps, Bar No. 37259
Law Office of William Most, L.L.C.
201 St. Charles Ave. Suite 114 #101
New Orleans, LA 70170
(504) 509-5023
williammost@gmail.com