**EXHIBIT 2**

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DE'JUAN THOMAS,
     Plaintiff

     V.                       3:17-cv-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,
JERRY GOODWIN, DOES 1-10
     Defendants
_____

BRIAN McNEAL,
     Plaintiff

     V.               No. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al
     Defendants
_____

ELLIS RAY HICKS,
     Plaintiff

     V.               No. 19-108-SDD-RLB

LOUISIANA DPS&C, et al
     Defendants
_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RODNEY GRANT,
     Plaintiff

     V.              Case No.17-cv-2797-NJB-DEK

MARLIN GUSMAN, et al
     Defendants

1          DEPOSITION OF SECRETARY JAMES LEBLANC,

2    given in the above-entitled causes, pursuant to

3    the following stipulation, before Raynel E.

4    Schule, Certified Shorthand Reporter in and for

5    the State of Louisiana, at the Louisiana

6    Department of Public Safety and Correction, 604

7    Mayflower Street, Baton Rouge, Louisiana, 70802,

8    commencing at 10:00 o'clock a.m., on Thursday,

9    the 23rd day of May, 2019.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                                        Page

3    Caption                            1

4    Appearances                        3

5    Agreement of Counsel               4

6    Examination

7         MR. MOST                      5

8    Reporter's Certificate            108

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:
 2    For the Plaintiffs:
 3    WILLIAM MOST, ESQ.
      Attorney at Law
 4    201 St. Charles Avenue, Suite 114#101
      New Orleans, Louisiana    70170
 5
 6    For the Defendants:
 7    TUNDE M. ANIMASHAUN
      Assistant Attorney General
 8    Section Chief, Civil Rights
      Litigation Division
 9    P.O. Box 94005
      Baton Rouge, Louisiana    70804
10
      and
11
      JAMES "GARY" EVANS
12    Assistant Attorney General
      Litigation Division
13    P.O. Box 94005
      Baton Rouge, Louisiana   70804
14
      and
15
      JEFFERY A. "BEAU" WHEELER, II
16    Assistant Attorney General
      Litigation Division
17    P.O. Box 94005
      Baton Rouge, Louisiana    70804
18
      And
19
      JONATHAN R. VINING
20    General Counsel
      Louisiana Department of Public Safety  &
21        Corrections
      P.O. Box 94304
22    Baton Rouge, Louisiana    70804
23    Also Present:  Stephen Geist
24    Reported By:  Raynel E. Schule
                    Certified Shorthand Reporter
25                  State of Louisiana
26
```

```
 1        been a problem with releasing people
 2        earlier than their release dates?
 3                  MR. EVANS:
 4                  Object to form.
 5                  You can answer.
 6                  THE WITNESS:
 7                  Earlier than their release dates,
 8            no.
 9   BY MR. MOST:
10   Q.    Has there been a problem with releasing
11        people later than their release dates?
12   A.    There -- there has been issues, yes.
13   Q.    When did you first learn about those
14        issues?
15   A.    Well, I think 2012 probably would be the --
16        the start of it, and when I was approached
17        by Governor Jindal's group that were doing
18        the Lean Six Sigma and -- so they came to
19        us and asked us what -- you know, what
20        areas is probably your biggest challenge
21        and -- and, you know, time comp has been a
22        real complicated issue throughout our
23        department.  It's a -- I call it a living
24        document, because it changes every year
25        depending on legislation that's changed.
```

1          So I said that's one of our challenges.
2          That's an area probably we need to look at.
3    Q.    Huh-huh.
4    A.    And so that -- that kind of surfaced the
5          issue of -- of immediate releases, and so
6          that -- to me that brought it to light, and
7          so we began the process of how based on
8          that report they did and how we do address
9          that, and one of them was centralizing our
10         -- our Preclass operations that was
11         decentralized out in -- in departments
12         throughout the department.  That was one of
13         the recommendations in that report, and
14         we've done that.  I think we have
15         approximately 140 to 50 people that work in
16         Preclass and some -- some part of the
17         department, not just at Headquarters.
18         Headquarters probably has 40, 50 people
19         that work in Preclass.  So we did that, and
20         -- and we have seen some improvement.  You
21         know, the other thing was turnover in those
22         operations, and -- and we had turnover, and
23         in probably around 2014, '13 or '14, we --
24         we put a $2.00 premium pay for that group
25         so they could -- maybe we could keep -- you

```
 1          know, settle the turnover down, and we're
 2          still -- we're still dealing with that.
 3          Funding is always an issue.  You know, a
 4          lot of things came out of that, you know,
 5          that -- that we've tried to address, and,
 6          you know, I -- I think about the Felony
 7          Task Force effect, the Class Task Force
 8          that was developed out of the -- out of the
 9          Justice Reinvestment Task Force, which I
10          chaired.  We recommended that we -- we
11          establish a Felony Class Task Force, which
12          was done, and that report was done and --
13          and part of that responsibility was
14          simplifying the way we do things in the
15          department and the way we class our -- our
16          felonies.  So it simplifies the way we have
17          to calculate time, and I -- I've testified
18          to that fact a few times during the task
19          force meetings.  I wasn't on the task
20          force, that task force, but I was asked to
21          testify.  So that -- you know, that was
22          another approach on -- on the way how can
23          we address this issue.  You know, here
24          lately, you know, I -- I mean, I think and
25          I -- I've asked a representative to -- to
```

```
1           -- to do the resolution, and she did.  I
2      don't know.  I'm trying to think of her
3      name, and I can't think of her name.
4               MR. VINING:
5               Katrina Jackson?
6               THE WITNESS:
7               Katrina Jackson to -- to -- and,
8           in fact, I talked to her at the
9           Sheriffs Association, at one of their
10          gatherings over there for the
11          Legislature, and she said she would, so
12          we -- we -- we moved in that direction
13          as far as trying to get the other
14          parties involved.  I -- I've met with
15          the clerk of courts.  I've met with
16          Debbie Hudnall.  I met with the Chief
17          Justice.  I met with -- I've met with
18          the Sheriffs Association, all
19          throughout this time trying to help
20          them understand the complications that
21          -- that are involved in figuring time,
22          and, you know, and I -- I hate to say
23          this, but it's liking herding cats.  I
24          mean, that's -- that's how I describe
25          it.  Everybody has got their own little
```

```
 1              -- clerk of courts have their own, you
 2              know, parish.  The sheriffs have their
 3              own parish, and the Judges have their
 4              own districts and -- and then getting
 5              them all on the same page is not an
 6              easy thing to do, and we're learning
 7              that just on the reinvestment side with
 8              trying to organize our reform efforts
 9              with -- with our communities and our --
10              our different segments of the criminal
11              justice system.  So you know, you know,
12              we were working in different areas to
13              try to -- try to -- to -- to make ends
14              meet with this issue.  I think the
15              resolution is good.  I think it -- it
16              -- you know, that we'll be able to
17              express our concerns and what the
18              issues are in this department and why.
19              You know, we made an attempt at a data
20              modernization project that would have
21              helped us, and, you know, it fell on
22              its face.  When we turned it on, it --
23              it was -- I don't think they
24              anticipated the number of users that
25              were going to be -- be partaking into
```

```
 1              that -- that system, and it just
 2              couldn't handle it, and so I made a
 3              decision to shut it down because it was
 4              becoming a public safety issue,
 5              especially on the probation parole
 6              side.
 7   BY MR. MOST:
 8   Q.   And when you say, "this issue" -- a few
 9        moments ago, you said, "working on this
10        issue" --
11   A.   Huh-huh.
12   Q.   -- you're talking about issues with time
13        computation, correct?
14   A.   Yes, yeah, on -- on immediate releases, on
15        how can we eliminate immediate releases,
16        what -- what do we need to do.
17   Q.   Right, and the problem with immediate
18        releases is that people are being held past
19        the end of their sentence, correct?
20   A.   Correct.
21   Q.   All right.  So that problem with people
22        being --
23   A.   People -- well, people are being held past
24        their release date.
25   Q.   Okay.
```

```
 1   A.    Their sentence in most cases still exists,
 2         because they're on parole.  They're not
 3         being held past their sentence.
 4   Q.    Okay.
 5   A.    They're being held past their release date.
 6   Q.    Their release date, which is the date that
 7         they should be released from prison?
 8   A.    Yes, yeah.
 9   Q.    Okay.
10   A.    But it's not past their sentence.
11   Q.    Fair enough.
12              MR. EVANS:
13              Hey, William, let's go off the
14         record for just one second.  Sorry.
15              MR. MOST:
16              Yeah, sure.
17              (Off the record.)
18   BY MR. MOST:
19   Q.    So this issue of people being held past
20         their release date was part of what
21         prompted the 2012 Lean Six Sigma Process,
22         right?
23   A.    Well, no.  I think basically it started out
24         as a complication of calculating time.
25   Q.    Huh-huh.
```

```
 1    A.    Not -- we didn't know that that problem
 2          existed.  I didn't know that problem
 3          existed at the time.  I was more concerned
 4          about simplifying the way we calculate
 5          time, automating, doing whatever we have to
 6          do to make it simpler, and -- and then it
 7          revolved in as they looked into this,
 8          that's when we realized that there were
 9          some -- there were immediate releases that
10          were taking place and -- and, look, the
11          other thing with this, and I -- you know,
12          I'm kind of getting off subject here, but,
13          I -- I mean, the other thing that -- that
14          we all need to understand, and I think has
15          amplified the immediate releases is what
16          we're doing at the local level now that we
17          weren't doing in 2012 with programs.  We
18          have in the neighborhood of -- of 60 jails
19          now that are participating in programs and
20          re-entry centers with our educational,
21          basic education programs, our vocational
22          programs, re-entry centers that -- that are
23          preparing people to return.  They're all
24          earning good time now, and they weren't
25          earning good time before.  So that -- that
```

```
 1            to me has -- has -- has -- has -- has kept
 2            us from eliminating the problem, because it
 3            has kind of added to the problem, but these
 4            are people that are getting out earlier
 5            than they would -- they couldn't have got
 6            out that early had we not began these
 7            programs.  I -- I kind of laugh at this.  I
 8            get -- I get sued on the front end for --
 9            for releasing people too early.  Now, I'm
10            getting sued for -- for keeping them too
11            long, you know, and -- and, you know, my
12            philosophy is I want to -- I -- I want them
13            out.  I don't want to keep them in prison.
14            You know, I mean, I think it's -- it's
15            something that we're striving for in this
16            department, and it's kind of ironic that
17            here I am, you know, but anyway, I -- I
18            wanted to say that.  I think it needs to be
19            said that --
20      Q.    Sure.
21      A.    -- that of the good things that we're doing
22            with the reinvestment is really creating a
23            problem of people getting out early, and --
24            and let me say this, people aren't -- when
25            people get sentenced to the department,
```

1    unfortunately, they'll go from the Baton

2    Rouge Courthouse to Catahoula, and don't go

3    through reception center.  So we're

4    changing that.  Now, everybody in the first

5    five parishes that we are investing in will

6    go to Raymond LaBorde and go through a

7    reception center, and we're going to be

8    chasing the paper.

9  Q.    Huh-huh.

10  A.    Now, whereas, the sheriffs, you know, they

11    -- they're not -- they don't have -- they

12    don't have to chase the paper.  They're not

13    worried about the paper.  We're worrying

14    about the paper, so changing that is going

15    to help us an awful lot in that we're going

16    to -- we're going to be chasing the paper

17    when it come to the -- to the reception

18    centers, and ultimately, we're bringing on

19    seven or eight more parishes come to July

20    1st.  So we're going to get it to 70 to 80

21    percent of our local prison population by

22    the end of next fiscal year.

23  Q.    So the idea there is that the Department of

24    Corrections won't wait for the sheriff to

25    bring them an inmate's paperwork; they'll

```
1    A.    Okay.  So I would assume that that's what
2          they -- you know, that they -- I think they
3          had supervisor, and they -- and they
4          improved that -- that area.  I think that's
5          what they did.
6    Q.    But you learned when you read this document
7          back in approximately 2012, that there was
8          an issue with inconsistencies in the
9          quality of the work of the time computation
10         people, correct?
11   A.    Yes.
12   Q.    Okay.  Flip to the page that's entitled,
13         "Recommendations."  It's about four or five
14         pages later.
15   A.    Okay.
16   Q.    These are recommendations from the Six
17         Sigma team to the Department of
18         Corrections.  Is that right?
19   A.    Correct.
20   Q.    Which of these did you implement?
21   A.    The first bullet, the second bullet, third
22         bullet, fourth bullet, and the fifth
23         bullet.  All of them.
24   Q.    What did you do to provide consistency of
25         procedures and training, which is the third
```

```
 1        So 2012, this study is done.  It discovers
 2        that there is a big problem with thousands
 3        of inmates being held past their release
 4        date for whatever reason, right?
 5   A.   Huh-huh.
 6   Q.   Okay.  Some things are changed right?  You
 7        -- you implemented some recommendations,
 8        right?
 9   A.   Correct.
10   Q.   What happened after that?
11   A.   What happened after that?
12   Q.   Yeah.
13   A.   I mean, things improved.  I mean, things
14        got better and -- and but it -- it wasn't
15        -- it wasn't a cure-all in the
16        recommendations obviously.
17   Q.   Right.
18   A.   Because we still were having paperwork
19        problems and getting the paperwork in a
20        timely fashion, and that's when we began,
21        and actually as I mentioned earlier with
22        the -- with the Felony Class Task Force,
23        that was -- that was part of the issue of
24        trying -- trying to fix the problem.  You
25        know, what we did with -- with -- with the
```

```
 1              -- with the modernization project, which we
 2              have gotten off the ground again, you know,
 3              is -- is going to help resolve the problem,
 4              and, you know, we're working on -- on --
 5              still continuing to work on improving the
 6              system and -- and hopefully this resolution
 7              will help us get to where we need to be.
 8     Q.    And by the modernization pro -- thing, are
 9              you describing the effort to replace CAJUN
10              with a new computer system around 2015?
11     A.    Correct.  Well, I mean, it -- now, it's --
12              it's off the ground again.  We have --
13              they've assigned -- the division has
14              assigned seven or eight people to us to --
15              to start that project again.
16     Q.    So in approximately 2015, a couple of
17              million dollars was spent to get a new
18              computer system to replace CAJUN?
19     A.    Right.
20     Q.    The new computer system didn't work, and so
21              the Department went back to CAJUN, correct?
22     A.    Correct.
23     Q.    The next data point I have about this issue
24              comes in 2017, and I'll have you look at
25              this document, which we're going to mark as
```

```
 1          "Exhibit C."  (Counsel hands document to
 2          witness.)  This appears to me to be a grant
 3          application from the Department of
 4          Corrections to the Federal Government.
 5          Have you seen this before?
 6   A.    You -- you know, I -- I have.  I've -- I've
 7          looked at it.
 8   Q.    Okay.  Is it a grant application from the
 9          Department of Corrections --
10   A.    Yes.
11   Q.    -- to the Federal Government?
12   A.    It -- it is -- it is, right.  Is this the
13          complete document?
14   Q.    There is the first --
15   A.    I have 15 of 19 --
16   Q.    Okay.
17   A.    -- so I don't have the whole document.
18   Q.    Exactly.  Okay.  Does this appear to be the
19          first 15 pages?
20   A.    Yeah, yeah.
21   Q.    I'm not trying to hide anything.  I'm --
22   A.    No, no, I know you're not.  I -- I just --
23   Q.    -- trying to save on printed paper.
24   A.    -- I just -- I was wondering if I had
25          signed this as an applicant.  That's why I
```

```
 1        was looking for the last page.
 2   Q.   Got it.  Okay, but you reviewed it at some
 3        point?
 4   A.   Yeah, I'm sure I did.  I don't -- I mean, I
 5        don't -- we have a Grant Application
 6        Section that -- that spends the time doing
 7        this --
 8   Q.   Huh-huh.
 9   A.   -- and ultimately, I -- you know, I don't
10        always have the time to read verbatim every
11        grant application.  Knowing the gist of
12        this is to develop a web portal --
13   Q.   Huh-huh.
14   A.   -- for the department to communicate with
15        those people that we have a hard time
16        communicating with.
17   Q.   Right.  So if you look at Page 4 --
18   A.   Okay.
19   Q.   -- in the second paragraph, it says, "In
20        2017 the Department of Public Safety &
21        Corrections had an average of 200 cases per
22        month considered an 'immediate release' due
23        to these deficiencies," correct?
24   A.   Correct.
25   Q.   Two sentences later it says, "A review of
```

```
 1          these releases indicate the offenders were
 2          held in custody an average of 49 days past
 3          the date they would have been eligible for
 4          diminution of sentence release," right?
 5    A.    Correct.
 6    Q.    So -- so in 2017 at least there were about
 7          200 people per month or about 2400 per year
 8          being held past their release date for an
 9          average of 49 days, correct?
10    A.    Correct, but I -- I don't know whether this
11          is eliminating the -- the good time
12          credits.
13    Q.    Okay.
14    A.    I mean, I -- I think we, you know -- I'm
15          not sure if it does or not.
16    Q.    Sure.  And by "good time credit," you mean
17          CTRP credit, not statutory good time,
18          right?
19    A.    Yeah.  I'm sorry.  That's it.
20    Q.    Yeah.  I just want to make sure we're on
21          the same page.
22    A.    Yeah, that's correct.
23    Q.    Okay.  So this is about five years after
24          the Six Sigma report, this -- this
25          testement, right?
```

```
1    A.    Huh-huh.

2    Q.    And it seems to me the issue is better than

3          it was in 2012?

4    A.    It is better, and I -- I would hope that

5          that doesn't -- that doesn't -- that

6          includes the -- the -- you know, the good

7          time or the certification time earned for

8          program time in that, which would make it

9          even better.

10   Q.    Right, because if this figure excludes CTRP

11         credit, it's still a big problem, right?

12   A.    Yeah, it's a problem, yeah.  I mean, I'm

13         not sure where they pulled the informa --

14         you know, I don't know where -- how they --

15         the 2017 data, I'm not sure where they got

16         that from, but I'm assuming they got it

17         right, but I would think they looked at all

18         immediate releases.  I don't think they

19         eliminated the -- but we can find that out.

20   Q.    The next sentence says, "immediate releases

21         are costing the state $239,022 per month,"

22         right?

23   A.    Yes.

24   Q.    So that suggests that these are people who

25         should be out, correct?
```

```
 1   A.    Correct.
 2   Q.    Okay.  These -- and did -- did you know
 3         about this back in 2017?
 4   A.    About the grant?
 5   Q.    No.  About these -- these figures or are
 6         you just seeing these now through the --
 7         this?
 8   A.    No.  Well, I mean, I saw it through the
 9         grant.
10   Q.    Okay.
11   A.    I didn't -- I didn't know the exact numbers
12         until I saw this.
13   Q.    Did you have a -- a sense of this even if
14         it wasn't the exact numbers in 2017?
15   A.    Actually, I -- you know, I -- I assumed
16         that things were improving based on all the
17         -- everything that we had done to improve
18         the system.  So I -- you know, I guess it
19         was a little bit of a surprise to me that
20         the numbers were still high as they are.
21   Q.    Yeah.
22   A.    But again, I -- I would -- I would have to
23         check on those numbers to make sure that
24         they didn't include the people that are in
25         the -- the good time credits and programs.
```

```
 1   A.    Correct.
 2   Q.    And it says, "DOC does not have any
 3         policies, procedures, manuals or
 4         agency-wide guidance that details the
 5         correct ways to calculate release dates,"
 6         correct?
 7   A.    Correct.
 8   Q.    Okay.
 9   A.    Now, if I can, I -- I would refer to our
10         response to those, and I don't have that in
11         front of me, but I would ask that that at
12         least be included in the statements that
13         we're talking about right now, because when
14         you look at -- at the error rate in our
15         department, one thing they looked at was
16         the error rate, and they didn't understand
17         that it was a hundred entries in every file
18         and ended up being an error rate of .26 of
19         one percent, and I know I think we all
20         probably admit that we make errors
21         occasionally, you know, so it was a pretty
22         good -- pretty good percentage in my -- in
23         my opinion of the error rate that we were
24         calculating.  They didn't -- they didn't
25         understand the process in my opinion.
```

```
 1   Q.   Huh-huh.
 2   A.   And so there -- therefore, they -- they
 3        threw out numbers that didn't make a whole
 4        lot of sense, just like they said that they
 5        had two people calculate time, and it was
 6        different, but they wouldn't tell us who
 7        they talked to or who calculated the time.
 8        Probably picked out somebody that was in
 9        training or didn't have the experience to
10        calculate time, and used them as an example
11        of being inconsistent, but they wouldn't --
12        they -- they didn't know who they talked to
13        or who -- who that person was that figured
14        the time.
15   Q.   Huh-huh.
16   A.   So I -- I just bring out as how
17        inconsistent they were in these findings
18        and not really understanding the process.
19   Q.   Do you have any reason to doubt that the
20        legislative auditor had two employees
21        calculate time, and they came up with
22        different answers?
23   A.   Had who?
24   Q.   So it sounds like you're referring to --
25   A.   Two of our employees --
```

1    Q.    Yes.

2    A.    -- they had calculating time, and it came

3          out with different figures.

4    Q.    Yeah, that's what it says in this report.

5    A.    Right, and but they didn't know who

6          calculated the time in our department.

7    Q.    Do you have any reason to doubt that that

8          actually happened?

9    A.    I have reason, yeah, because they didn't --

10         first of all, they couldn't tell us who did

11         it.  It may have happened, but what I'm

12         telling you is that they probably gave it

13         to somebody, an employee, who isn't through

14         training.  I mean, we didn't know.  They

15         couldn't tell us who -- who did the

16         calculation of time.  So we took exception

17         to that finding based on that.

18   Q.    Did you have a training program at the time

19         for time calculation of --

20   A.    I -- I'm not sure if it was -- I'm -- I'm

21         -- you know, I think it was.  I think in

22         our response, we indicated that we have a

23         training manual, and we referenced three or

24         four different regulations that we have

25         that reference calculating time.

```
 1    Q.   So let's look at this document which I've
 2         marked "Exhibit E."  This is your response
 3         that you're describing, correct?  (Counsel
 4         hands document to witness.)
 5    A.   Huh-huh.
 6    Q.   So if you look at Page A.4 --
 7    A.   Okay.
 8    Q.   -- in the third paragraph from the bottom,
 9         it says, "DPS&C has implemented a plan to
10         provide a basic Pre-Class and Time
11         Calculation training program for all new
12         hires in that Department."
13    A.   Where are you?
14    Q.   I'm sorry.
15    A.   Are you in the middle of it somewhere?
16         Okay, yeah.
17    Q.   "DPS" -- "DPS&C has implemented a plan" --
18         do you see where I am?
19    A.   Huh-huh.
20    Q.   -- "to provide basic Pre-Class and Time
21         Calculation training program for all new
22         hires in that Department."  So that -- do
23         you see where it says that?
24    A.   Yes.
25    Q.   So that was a new training program that had
```

```
 1              Where do you get these numbers
 2         from, Jonathan?  That's what I want to
 3         know.
 4   BY MR. MOST:
 5   Q.   Do you have any reason to believe these
 6        numbers are not correct?
 7   A.   No.  I mean, I -- no.
 8   Q.   Did you read this article when it came out?
 9   A.   I don't -- I don't know that I did
10        honestly.
11   Q.   So it sounds like there's -- there's still
12        a problem with this.  Is that fair to say?
13   A.   According to Jonathan, yeah.
14   Q.   Okay.  If these numbers are correct, is
15        there still a problem?
16   A.   Yep, there is.  I think that's why we're
17        doing what we're doing, and look, the other
18        thing -- and I -- things come to mind
19        occasionally, and I -- I have to mention it
20        is that one thing I failed to mention in
21        what we -- is the Uniform Commitment Order.
22        We spent many, many, many, many manhours
23        reformatting the Uniform Commitment Order
24        to help us in that -- and that be the
25        document that we use to calculate time.
```

1    Q.    Huh-huh.

2    A.    Rather than waiting on all the -- in fact,

3          we changed -- we changed legislation to

4          help us do that, but nobody, no judge,

5          nobody will use it.  I mean, they'll -- or

6          they'll change the document to accommodate

7          what they want to do.  I mean, that's --

8          that's the kind of -- that's what we're

9          dealing with.  You know, we had what we

10         thought was a good way to address this.

11         Well, you know, and -- and -- and the

12         Supreme Court adopted it as I appreciate

13         it, and they just don't -- they don't

14         listen.  I mean, the judges just don't.  I

15         don't know what the deal is with that, but

16         anyway, I mean, that was another -- we -- I

17         mean, we spent a lot of time in meeting

18         with judges and going through that Uniform

19         Commitment Order to -- to get it to where

20         you could figure time from it and not have

21         to have the sentencing minutes, have those

22         things so we could go ahead and do this,

23         and it fell right on its face.

24    Q.    Huh-huh.

25    A.    You know, I mean, everywhere we turn to try

```
 1            to fix it, it falls on its face, but
 2            outside of our authority, and -- and, you
 3            know, I -- I don't know how else to say it.
 4            I mean, I -- you know, it's not that we're
 5            ignoring the problem.  We're -- we're
 6            fighting every avenue to make -- to fix
 7            this, and we just run into walls, and --
 8            and finally, you know, you know, in talking
 9            to Katrina, I said, "Katrina, can you help
10            me with this.  Let's" -- "Let's at least
11            put a resolution together."  A resolution
12            is what it is, a resolution, but and get --
13            get the judiciary and -- and I think it's
14            Jud C, one of the -- one of the -- I think
15            it's Jud C or Jud B, one of them involved,
16            and let's -- let's have some hearings.
17    Q.    Yeah.
18    A.    You know, it's -- it's not anything we're
19            putting under the table.  I mean, Six Sigma
20            was -- I mean, that brought it to light,
21            but we were trying to fix things then to --
22            to make it better on how you calculate time
23            to make it easier for us and -- and more
24            efficient, but I -- you know, and -- and
25            remembering, William, that, you know, we
```

```
 1          were dealing -- during -- during between
 2          2008 and 2016, '17, we -- we were taking
 3          200 million dollars in cuts and lost four
 4          prisons and 2000 employees.  My focus is --
 5          is surviving, you know, and, you know,
 6          there's a lot of things going on besides
 7          figuring time for me.  I mean, you know,
 8          you have -- I hope you understand that, and
 9          but, you know, it's not like we -- we're
10          trying to avoid this issue.  We want to --
11          we want to fix this issue, and we -- we
12          have made every attempt at -- at fixing
13          this issue so --
14     Q.   And one thing you said that you may do in
15          the future, but haven't done in the past is
16          send -- is actually go out and get the
17          paperwork --
18     A.   Yeah.
19     Q.   -- the Department of Corrections itself?
20     A.   Yeah, that's right.  That's right, and --
21          and we -- we need reception centers to do
22          that.  I opened a new reception center to
23          -- to take in the five, but there -- it
24          wasn't just about the paperwork.  It was
25          about bringing people in and evaluating who
```