UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BRIAN McNEAL,

      Plaintiff,

  V.                      NO. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al.

      Defendants.

      30(b)(6) DEPOSITION OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, through its designated representative, DEREK ELLIS, given in the above-entitled cause, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, at the Louisiana Department of Public Safety & Corrections, 504 Mayflower Street, Baton Rouge, Louisiana, on the 31st day of May, 2019.

```
 1    APPEARANCES:
 2
              WILLIAM MOST,
 3            ATTORNEY AT LAW
              201 St. Charles Avenue
 4            Suite 114, #101
              New Orleans,Louisiana   70170
 5            Representing the Plaintiffs
 6

 7            LOUISIANA DEPARTMENT OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
 8            BY:   JAMES "GARY" EVANS, ATTORNEY AT LAW
              EATHER HOOD, ATTORNEY AT LAW
 9            ELIZABETH DESSELLE, ATTORNEY AT LAW
              1885 N. Third Street
10            Baton Rouge, Louisiana   70802
              Representing the Defendants
11
12
13
      Reported By:
14
              Sandra P. DiFebbo
15            Certified Shorthand Reporter
              State of Louisiana
16
17
18
19
20
21
22
23
24
25
```

1            DEREK ELLIS, 504 Mayflower Street,
2       Baton Rouge, Louisiana, 70802, having been
3       first duly sworn, was examined and testified
4        on his oath as follows:
5  EXAMINATION BY MR. MOST:
6       Q.   Mr. Ellis, thank you for being here
7  today.  My name is William Most.  I'm the attorney
8  for the plaintiff, Brian McNeal, in this case.
9  Could you give your name and title for the record?
10      A.   Derek Ellis, Deputy Assistant Secretary.
11           MR. MOST:
12                Mr. Evans, can we stipulate that
13           today's deposition was properly
14           noticed, and the court reporter is duly
15           qualified?
16           MR. EVANS:
17                Yes.  We'll note for the record I
18           think the notice had a different
19           deposition date, but we agreed to hold
20           it today.
21           MR. MOST:
22                Correct.  Thank you.
23  BY MR. MOST:
24      Q.   Mr. Ellis, you have given depositions
25  before, correct?

1    Q.   Was there any procedure or policy in
2    place to avoid specifically what happened to
3    Mr. McNeal?
4    A.   There is no policy or written procedure.
5    Q.   Is there an unwritten procedure to avoid
6    specifically what happened to Mr. McNeal?
7    A.   There is a procedure in place that didn't
8    work in this case, but there is a procedure in
9    place.
10   Q.   By procedure, do you mean that it's okay
11   for someone's Certificate of Release to go to one
12   place and the inmate actually be sent to another
13   place because there is the expectation that they
14   will wind up in the facility where their
15   Certificate of Release is?
16   A.   Yes.
17   Q.   So there is no policy or procedure,
18   whether written or unwritten, to address the
19   problem of what happens when someone does not wind
20   up in that facility where their certificate of
21   release is; is that correct?
22        MR. EVANS:
23             Object to form.  You can answer.
24        THE WITNESS:
25             There is a procedure.  It is not

```
 1              written.  And -- go ahead.  I'm sorry.
 2              Were you starting something?
 3   BY MR. MOST:
 4        Q.    What is the procedure?
 5        A.    So the procedure is if that somebody is
 6   ordered to a technical revocation, to Steve Hoyle
 7   program, the paperwork is originated from the
 8   Probation & Parole District, sent to headquarters,
 9   documented on a list, forwarded to the appropriate
10   people for the treatment program, the transfer
11   department, and then for them to be moved to Hunt.
12   From Hunt, they move to Bossier.  Historically, if
13   there was -- in very few instances if they didn't
14   go, then some -- again that's -- the notification
15   should have been made, if that's what you're
16   asking, to Hunt.
17        Q.    So medical at Hunt has to clear people to
18   go to Steve Hoyle, correct?
19        A.    Yes.  I say that.  They can prevent them
20   or they can cancel the transfer.  They don't
21   necessarily have to clear them, but if there is a
22   concern of them, they can cancel the transfer.
23        Q.    Hunt medical gives people the thumbs up
24   or thumbs down to go to Steve Hoyle, right?
25        A.    Correct.  Well, they can.  If they want
```

1  to, they can, yes.
2      Q.   Someone within DOC medical has to give
3  someone the thumbs up or thumbs down to go to Steve
4  Hoyle, right?
5      A.   Yes.
6      Q.   You're saying if they get the thumbs
7  down, and they wind up not going to Steve Hoyle,
8  someone should notify the proper people to make
9  sure the Certificate of Release winds up where the
10 person actually is?  Is that what you're saying?
11     A.   Yes, but, you know, there is also the
12 notification of the court in those type of things.
13 It could be changed.
14     Q.   What was supposed to happen didn't happen
15 here, correct?
16     A.   Correct.
17     Q.   Who is that person who is supposed to
18 ensure that the Certificate of Release winds up at
19 the facility where the person actually is in the
20 event that they wind up not going to Steve Hoyle?
21     A.   I don't think there is a specified person
22 to do that.  There is a group involved in the
23 process, and I think at any point, you know, we
24 don't have to designate a person specifically in
25 this case that I can say this person should have

```
 1   what happened to Mr. McNeal happening to someone
 2   else today, correct?
 3        A.   No.  I don't know the answer to that.
 4   I'm trying to wrack my brain, but I don't know the
 5   answer to that.  I'd have to ask follow-up
 6   questions to that group.
 7        Q.   So once Mr. McNeal got to Hunt, he was
 8   taken to HRDC, right?
 9        A.   Yes.
10        Q.   That stands for Hunt Reception &
11   Diagnostic Center, correct?
12        A.   Yes.
13        Q.   That is a facility within Hunt prison
14   where inmates are brought after their sentencing to
15   be then distributed out to other prisons within the
16   DOC, right?
17        A.   For the intake process, yes.
18        Q.   So it's kind of like the waiting room of
19   the DOC.  You go there first.  You get processed,
20   and then you go to wherever you are going to spend
21   the rest of your sentence, correct?
22        A.   Yes, but that process is not applicable
23   in this case.
24        Q.   Well, he was supposed to go -- Mr. McNeal
25   was supposed to go to HRDC then to Steve Hoyle,
```

```
 1        Q.   I see your point.  There are certain
 2   programs that Mr. McNeal could have done if he had
 3   been in Steve Hoyle or a different DOC facility,
 4   but he could not because he was in the HRDC,
 5   correct?
 6        A.   He could not have gone to any other DOC
 7   facility.  He was specifically ordered to Steve
 8   Hoyle as a technical probation revocation, so he
 9   didn't get time calculation.  He didn't -- you
10   know, none of that occurred, because he was still
11   under the parameters of that probation.
12        Q.   But the DOC chose to hold him in HRDC as
13   opposed to Hunt?
14        A.   Yes.
15        Q.   Main population, right?
16        A.   Yes.
17        Q.   If he had been in Hunt main population,
18   he would have had access to a bunch of other
19   programs and services that he didn't have access to
20   in HRDC, correct?
21             MR. EVANS:
22                  Object form.  You can answer.
23             THE WITNESS:
24                  I don't know.  You'd have to ask
25             Warden Hooper.  I know he wouldn't
```