# Management of Offender Data: Processes for Ensuring Accuracy

## Department of Corrections



Performance Audit Services
Issued October 25, 2017



## Objective: To evaluate the Department of Corrections' management of offender data.

Overall, we found that DOC needs to implement or strengthen existing policies and procedures to more effectively manage offender data, including better tracking of offender locations and a consistent method of calculating release dates. In addition, data stored in CAJUN is not always accurate, which can limit DOC's and stakeholders' decision-making abilities. We identified the following issues:

- **Offender locations are not always accurate in CAJUN, particularly for offenders housed in local facilities, because DOC policy does not include a timeframe for when local facilities must notify DOC of a transfer to another local facility.** We reviewed 100 files and found 11 (11%) offenders who were at a facility other that what was in CAJUN. Of these 11 offenders, four (36.4%) were violent offenders.

- **DOC's procedures for monitoring offender data entry, especially for offenders in local facilities, are not sufficient to identify all data errors.** We sampled 100 offender files at nine local facilities and one state facility and found that 19% of offender files had at least one error in CAJUN.

- **DOC's process for calculating offender release dates is inconsistent, which can result in errors.** Calculating an offender's release date includes both manual calculations performed by staff and automatic calculations performed by CAJUN. DOC does not have any policies, procedures, manuals, or agency-wide guidance that details the correct ways to calculate release dates.

- **Former DOC employees still have access to CAJUN and have the ability to change data.** We found that 38% of CAJUN user IDs were assigned to former DOC employees, which poses a risk to the security of CAJUN data. DOC lacks policies and procedures for making and monitoring changes to CAJUN, which poses a risk to the security of the system.

- **DOC spent $3.6 million on a new data system that was supposed to have allowed for better tracking of offenders. However, the system failed due to inadequate planning and testing.** The OMS went live on June 15, 2015, and it was taken offline on July 31, 2015, due to system failures.

These findings are explained in more detail on the following pages.

**Offender locations are not always accurate in CAJUN, particularly for offenders housed in local facilities, because DOC policy does not include a timeframe for when local facilities must notify DOC of a transfer to another local facility.**

According to DOC, during calendar year 2016 it took an average of 22 days from the time an offender was transferred to another facility for the transfer to be input into CAJUN. This means that for 22 days, DOC did not know the location of a given offender. We reviewed 100 files and found 11 (11%) who were at a facility other that what was in CAJUN. Of these 11 offenders, four (36.4%) were violent offenders. In one such case, DOC thought an offender convicted of attempted second-degree murder was at the Evangeline Parish Jail for 166 days, when that offender was located at another facility more than 100 miles away. Part of DOC's mission is to "enhance public safety through the safe and secure incarceration of offenders." However, inaccurate offender locations in CAJUN make it difficult for DOC to meet this mission. Exhibit 1 shows the offenders in our review that were not at the local facility stated in CAJUN.

### Exhibit 1
### Offenders Located in Another Facility than CAJUN Record
### As of May 2, 2017

| Offender | Offense | Offender Type | Facility In CAJUN | Days CAJUN Not Accurate |
|---|---|---|---|---|
| Offender 1 | 40:967 - Possession of Schedule II drug<br>14:31 - Manslaughter; habitual offender | Violent | Orleans Parish Prison | 200 |
| Offender 2 | 14:30.1 - Attempted second degree murder | Violent | Evangeline Parish Jail | 166 |
| Offender 3 | 40:967 - Possession of Schedule II drug (GHB) | Nonviolent | Evangeline Parish Jail | 151 |
| Offender 4 | 14:62.4 - Unauthorized entry of a place of business; habitual offender | Nonviolent | Orleans Parish Prison | 70 |
| Offender 5 | 40:967 - Possession/PWID of Schedule II drug | Nonviolent | Winn Parish Jail | 70 |
| Offender 6 | 14:95.1 - Possession of firearm by felon<br>14:129.1 - intimidating, impeding, or injuring witnesses or officers<br>14:37.4 - Aggravated assault with a firearm; 4 counts | Violent | Orleans Parish Prison | 57 |
| Offender 7 | 14:31 - Attempted manslaughter<br>14:30.1 - Attempted second degree murder | Violent | Lafayette Parish Correctional Center | 53 |
| Offender 8 | 40:966 - Possession/PWID of Schedule I drug; 3rd offense | Nonviolent | Orleans Parish Prison | 46 |
| Offender 9 | 14:68.4 - Unauthorized use of motor vehicle | Nonviolent | St. Landry Parish Jail | 26 |
| Offender 10 | 40:967 - Possession/PWID of Schedule II drug | Nonviolent | Orleans Parish Prison | 6 |
| Offender 11 | 14:68.4 - Unauthorized use of motor vehicle | Nonviolent | East Baton Rouge Parish Prison | released 7 days prior |

Source: Prepared by legislative auditor's staff using CAJUN data and local facility interviews.

## DOC's process for calculating offender release dates is inconsistent, which can result in errors.

DOC does not have a formalized, consistent method for calculating offender release dates. Once an offender is sentenced by a judge and processed by DOC, staff calculates the offender's release date based on a variety of potential factors. Exhibit 5 lists some factors that affect an offender's release date. Calculating an offender's release date includes both manual calculations performed by staff and automatic calculations performed by CAJUN. Because each offender's circumstances can differ, calculating release dates is a complicated process, and DOC does not have a standard method by which to perform this calculation. For example, the calculation for an offender who violated parole with consecutive sentences is different than for a parole violator with concurrent sentences and received credit for time served prior to conviction.[9] Staff may have to manually calculate a new sentence length based on how long an offender was incarcerated and on parole.

**Exhibit 5**
**Factors Affecting Release Date Calculation**

- Day sentence starts
- Length of sentence
- Credit for time served
- Good time release ratio
- Credits earned for certified treatment or rehabilitation programs
- Good time credit lost due to behavior
- Parole revocation recalculations

While the underlying calculations in CAJUN are correct, accurate release dates are contingent on staff entering correct data into the system. DOC does not have any policies, procedures, manuals, or standardized guidance that outlines the correct way to calculate release dates. This leads to inconsistent calculation methods. For example, we asked two DOC staff to calculate release dates on the same offender, and each staff used a different method to calculate the release date. The two results differed by 186 days. While this example was hypothetical, it illustrates the risk of error when there is no specific, agency-wide guidance or template for staff to use. According to DOC, it is developing standard procedures and training materials for time computations.

In addition, DOC does not have a policy requiring initial release date computations to be reviewed by a supervisor. According to DOC, its goal is to review initial release date computations, but usually there is not enough time or staff to review them all. Prior to releasing an offender, DOC staff review the offender's file, checking for errors and re-calculating the release date. Errors in release date computations should be caught during this review; however, an offender could be held too long if the release date was miscalculated and not caught until shortly before release. This could result in the state paying more than it should have to incarcerate the offender.

**Recommendation 5:** DOC should develop formal policies and procedures for calculating release dates and consider developing a template that could assist staff in calculations.

---

[9] Consecutive sentences are served back-to-back, while concurrent sentences are served at the same time.

9

**Summary of Management's Response:** DOC agrees with this recommendation and stated that each Specialist has a guide, along with Department Regulations, to figure out the time computation process under the guidance of a Supervisor. Due to ever-changing laws, DOC continues to get new Time Computation Acts and must still apply old Time Computation Acts that do not change. Each of these Acts requires different methods of calculation. A training booklet has been started to step an employee through the time computation process to determine if the offender needs recalculating and what Time Computation Act the offender will fall under. Additionally, DOC plans to provide a basic Pre-Class and Time Computation training program to all new hires in that department. See Appendix A for DOC's full response.

> **Former DOC employees still have access to CAJUN and have the ability to change data. We found that 38% of CAJUN user IDs were assigned to former DOC employees, which poses a risk to the security of CAJUN data.**

DOC has not established policies and procedures for granting, monitoring, and revoking access to CAJUN and its Active Directory, and no one has performed the duties of revoking this access upon DOC employee termination.[10] Additionally, users who have transferred to different DOC positions have retained their prior access to CAJUN. Without proper revocation procedures, there is a risk that former DOC employees may be able to make unauthorized changes to offender data. Of the 216 Office of Adult Services user IDs that permit changes to offender data, 83 (38%) did not match any current employees. For example, we found one instance where an employee was separated from DOC, and there was a change to CAJUN data made with her user ID after her separation. While there may have been a valid reason for the actual change, not deactivating user IDs after separation or termination is high-risk, as CAJUN does not log changes to offender records. According to DOC, after LLA identified this issue, the department conducted audits of the CAJUN user IDs and revoked access to former employees and employees who transferred to different divisions. However, DOC has not yet developed a formal policy.

In addition, although DOC has a database that stores application changes[11] with supporting documentation, it lacks adequate procedures for making regular and emergency changes. Because CAJUN is an antiquated system, it cannot identify changes made to the system, such as changes to how CAJUN performs calculations, increasing the need for independent monitoring procedures. Inadequate procedures for implementing and monitoring changes to CAJUN could lead to unauthorized and undetected changes that cause errors in system processing and data. According to *Control Objectives for Information and Related Technology* (COBIT),[12] management should implement business roles, responsibilities, levels of

---

[10] In 2014, DOC's IT services were consolidated with the state's Office of Technology Services (OTS).
[11] Application changes include proper authorization, development, testing, approval, and separation of duties.
[12] COBIT is a best-practice, IT governance framework created by the international professional association ISACA. This framework emphasizes regulatory compliance and the benefits of managing risk effectively.



# Department of Public Safety & Corrections
### State of Louisiana

JOHN BEL EDWARDS
Governor

JAMES M. LE BLANC
Secretary

October 13, 2017

Daryl G. Purpera, CPA, CFE, Legislative Auditor
Louisiana Legislative Auditor's Office
P.O. Box 94397
Baton Rouge, LA 70804-9397

Dear Mr. Purpera:

Please accept this as the Department of Public Safety and Corrections—Corrections Services' (DPS&C-CS) response to the recent IT/Performance audit conducted at the Department. It should be noted that the Department has either already completed several initiatives to address the findings and recommendations noted in the report or is currently taking steps to address the findings and recommendations.

In the "Introduction" to this report, there is a notation of the 2012 audit finding relative to Probation and Parole Officer contacts. The Department wants to point out again, that there are multiple factors that contribute to a missed contact. Offender non-compliance with reporting requirements is expected and failure to report for a scheduled appointment does not always require immediate action. In fact, many times numerous attempts to contact the offender were made but failed to result in an actual contact. There are procedures in place to address multiple failures to contact the offender by the assigned officer. Another factor is that the Division of Probation and Parole has experienced issues with officer retention. The audit period was a particularly difficult time for officer retention, which continues to be an issue today. At the most critical times, contacts are prioritized to focus on higher risk offenders (i.e. sex offenders, violent offenders, DWI, etc.) which contributed to missed contacts for lower risk offenders. We are well aware of the importance of this issue and our P&P staff continue to work towards every opportunity for improvement in this area.

While the Department agrees with the recommendations, provided herein is additional information and/or clarification:

**Finding #1:** Offender locations are not always accurate in CAJUN, particularly for offenders housed in local facilities, because DOC policy does not include a time frame for when local facilities must notify DOC of a transfer to another local facility.

First and foremost, we must clarify that Department Regulation C-05-004, Basic Jail Guidelines (BJG), require our local jail partners to report to DPS&C when an offender is moved from their facility to another local jail facility. While the recommendation for a specific time frame for

A.1

P.O. Box 94304 · Baton Rouge, Louisiana 70804 · (225) 342-6140 · Fax (225) 342-1695 · www.doc.la.gov
An Equal Opportunity Employer


EXHIBIT E

notification from the local level to the Office of Adult Services will be implemented in the next revision to the Basic Jail Guidelines policy, the existing practice has not hampered our ability to meet our mission and **has not caused an increased risk to public safety,** as offenders are being accounted for at the local level in accordance with our agreement with the Sheriffs who house them.

As the practice exists today, the CAJUN system is updated with the accurate location as soon as we are notified or as soon as staff identify the offender has moved (either through normal case work or through our billing audit process). DPS&C is dependent upon the 104 local jail facilities to notify us when an offender is transferred out of or received at their unit. When we identify an incorrect location, staff verify the offender's current location by contacting the last known location and tracking subsequent transfers until the location is verified.

The 104 local jails that we work with assign (and often reassign) staff responsibility for the required notification process and with the approximately 3,500 offender transfers per month at the local level, we must acknowledge the margin for human error that exists using the existing call-in reporting system. As such, we will add this notification process to our future BJG Monitoring site visits as an opportunity to discuss the importance of timely notifications with the staff at the local jails.

While the report notes "inaccurate" reimbursement amounts, it is important to understand that the billing system that is in place ensures that any overpayments or underpayments for offenders to a specific jail are corrected through the billing procedures in place, which ensure only one payment can be made per day for each offender in custody. As of August 17, 2017, the Department has increased the percentage of jails to 50% that will be audited.

**Recommendation 1:** DOC should revise its policy for local facilities to include a timeframe for local facilities to notify DOC of transfers. DOC should also develop a process for updating CAJUN in a timely manner.

- **Management's Response:** The Department will revise the Basic Jail Guidelines to ensure a required time frame for transfer notifications and ensure this process is part of the BJG monitoring visits. As previously noted, CAJUN is already updated by DOC staff as we are notified or become aware of a location change at the local level.

**Recommendation 2:** DOC may want to consider expanding billing audits to cover more local facilities as these facilities hold a higher risk for billing errors.

- **Management's Response:** As noted above, as of August 2017, the DOC will complete a quarterly payment audit for at least 50% of the local facilities annually.

**Finding #2: DOC's procedures for monitoring of offender data entry, especially for offenders in local facilities, are not sufficient to identify all data errors**

It should be noted that there are 100 data entry fields when entering a regular Pre-Class case with one sentence and one offense (not including the time computation fields). Therefore, for the 100 files that were reviewed, there were 10,000 data entry points where an error could be made. Only 26 total errors were found, resulting in a 0.26% error rate.

We disagree with the indication that DPS&C-CS does not include offenders housed in local facilities in its quality assurance audits and that we only correct errors detected through state facility reviews. We correct errors on any offender file when they are identified, regardless of where they are housed. While workload does impact the time available for existing staff to conduct quality assurance checks on every case worked, staff do conduct quality assurance checks on files. If through this process, an error is identified, it is corrected. Lastly, while the audit report reflects that the checks and balance system we have in place at the back end of a sentence is not sufficient to ensuring an offender isn't held over their release date, the entire record of every offender who is processed for release is checked for complete accuracy approximately 45 days prior to release. Offenders have every opportunity to file an Administrative Remedy Request if they feel their release date is past the intended release and can use this process to request a review of his time computation.

**Data entry errors in CAJUN would not impact the identification process.** LLA noted a review of 100 offender files at nine local facilities and one state facility and reported 19 offender files had errors in CAJUN and that these errors limit DPS&C-CS's ability to identify offenders, to assess their eligibility for participating in programs or earning credits for early release, and to calculate their release dates. It is important to note that the identification of offenders is based on his/her finger prints through AFIS, his state police rap sheet and his FBI rap sheet. Of the errors reported, only one impacted the actual time computation of the offender and it would have been discovered and corrected as part of the review at discharge.

The audit report indicates that we rely on a manual process for inputting offender data and that DPS&C-CS permits entry of incomplete records into CAJUN with plans to update after receiving the complete information. It is important to understand that there is no automated process available for data input at this time and that manually entering case information is the only way to build a record in our system. As such, when we receive partial pre-classification paperwork on an offender, we enter the information we have so that we can have a record of the offender while we attempt to get the remaining paperwork from the local jail. This is part of building an offender record. In these instances, the offender record is documented in "I" (Incomplete) status so that others looking at the CAJUN file can be alerted to the fact that we are awaiting paperwork on that offender to verify identity and complete time computation. The record is updated when the paperwork is received, the time computation is complete, and the record is changed to "R" (Ready) status. However, incomplete simply means the offender is not verified as a DPS&C CS offender or not updated in CAJUN for time computation. In our opinion, it is much more logical and efficient to enter as much data as is available into an incomplete CAJUN file than it is to simply stack offender paperwork awaiting a complete record and not have any record of the offender in CAJUN at all.

The audit report identifies issues with incorrect, incomplete, or decentralized DPS&C-CS documentation that limits DPS&C-CS's ability to correct errors. In 2012, DPS&C-CS centralized this function to the degree possible following a Lean Six Sigma project study which resulted in the recommendation of centralization.

**Recommendation 3:** DOC should include local facilities when it samples offender files for review.

- **Management's Response:** Each of the six Pre-Class groups will be required to audit an average of 25 cases per month, in addition to the audits of cases being worked by newer employees and all releases. The audit will be based on the same criteria as the institution audits.

**Recommendation 4:** DOC should implement additional edits in CAJUN where possible and establish procedure for using and monitoring reports to detect errors where edits cannot be applied, such as fields with duplicate data entry.

- **Management's Response:** The DPS&C will explore additional edits, under the guidance of a team composed of both Office of Adult Services and Probation and Parole staff to determine what edits, reporting or changes are necessary to increase reliability and efficiency. Concurrent with this effort the Department will develop reports to help detect errors specifically in fields that require duplicate entry. Once the necessary edits or reports have been identified and established, a written policy will be implemented.

**Finding #3: DOC's process for calculating offender release dates is inconsistent, which can result in errors in offender release dates**

Time computation is very complex and ever changing. Each year, as legislation is passed, our entire staff must be retrained to learn how the new laws affect their work while still applying old statutes that remain applicable. The turnover rate among the staff in the time computation area is very high as these are entry level jobs. For example, in the last year the turnover in this area has been 33%. Training for this job is ongoing at all times and takes time to truly understand the intricacies of how each case must be handled. DPS&C-CS has implemented a plan to provide a basic Pre-Class and Time Calculation training program for all new hires in that Department. We will also conduct a yearly in-service training for all Pre-Class staff at the end of each Legislative Session to address all changes to Statutes that affect Time Calculation.

Calculating each offender's release dates is a complex process with up to 20 different criteria that impacts the computation process. Every offender's criminal history is different and up until the 2017 Justice Reinvestment legislation, the offender's class had an impact on the time computation process. In addition, each legislative session that results in a change to laws that impact time computation requires the Department to develop a new method to implement the change and clarify the impacts of the change to existing laws and adjust training accordingly. In addition, when the legislation is perspective only, it means that we continue to have cases that must be worked and tracked following the old law. As such, time computation staff are expected to know (or learn if they are new staff) all laws, old and new, that impact time computation and the dates they are in effect. Each of these laws then have a related method of calculation.

We provide each staff member with a guide, entitled "Time Computation Instructions" and Department Regulations B-04-001 "Sentence Computation and Good Time Credits", B-04-004 "Determination of Offender Class and Computation of PAR Eligibility", B-04-006 "Restoration of Good Time", B-04-003 "CTRP Earned Credits" (all attached) to use and refer to in computing cases. In addition, each staff member works under the guidance of a Supervisor that is available to answer questions and train them through unique cases. We are finalizing a new training manual

A.4

with step by step instructions for each type of case and will complete this new manual once the 2017 Justice Reinvestment legislation work to re-compute those impacted is complete.

While we do not require every initial time computation case to be reviewed by a supervisor, we do require supervisors to check all time computation done by employee with less experience. In addition, every time computation is checked by supervisors during release processing, an average of 1,373 per month. Our staff work an average of 4,213 offender files per month for time computation or re-computation and a 100% audit of every case is not a reasonable expectation. Additional auditing of offender files would certainly be beneficial and going forward, each of the 6 Pre-Class groups will audit an average of 25 cases per month in addition to the audits of cases being worked by newer employees and releases. The audit will be based on the same criteria as the institution audits.

**Recommendation 5:** DOC should develop formal policies and procedures for calculating release dates and consider developing a template that could assist staff in calculations.

- **Management's Response:** Each Specialist has a guide along with Department Regulations (B-04-001 "Sentence Computation and Good Time Credits", B-04-004 "Determination of Offender Class and Computation of PAR Eligibility", B-04-006 "Restoration of Good Time", B-04-003 "CTRP Earned Credits") to figure out the time computation process under the guidance of Supervisor. Due to ever changing laws, we continue to get new Time Computation Acts and still must apply old Time Computation Acts that do not change. Each of these Acts require different methods of calculation. A training booklet has been started to step an employee through the time computation process to determine if the offender needs recalculating and what Time Computation Act the offender will fall under. Additionally, DPS&C-CS has implemented a plan to provide a basic Pre-Class and Time Calculation training program for all new hires in that Department. We will also conduct a yearly in-service training for all Pre-Cclass staff at the end of each Legislative Session to address all changes to Statutes that affect Time Calculation.

**Finding #4:** Former DOC employees still have access to CAJUN and have the ability to change data. We found that 38% of CAJUN user IDs were assigned to former DOC employees, which poses a risk to the security of CAJUN data.

Prior to the consolidation of IT staff to the Division of Administration, the Human Resources Department at DPS&C-CS Headquarters would inform the then DPS&C-CS Office of Information Services of an employee's departure and all actions were handled internal to the Department. However, after consolidation, the specific transferred OTS employee that was responsible for terminating access left that position and the duties were not reassigned. Since the original IT audit was completed in 2016, the Department has coordinated internally to ensure these responsibilities are being addressed. Going forward, employee access to CAJUN will be managed by Office of Adult Services staff and monitored and updated on a monthly basis, for separations and transfers. The Department has also completed a review of those employees that have access to CAJUN to ensure all are current employees whose job responsibilities require access to CAJUN.

Case 3:18-cv-00736-JWD-EWD    Document 136-13    07/09/24    Page 12 of 14

Page 6 of 7

Furthermore, with regards to system changes to CAJUN, while there is no formal written policy, the Department uses a help ticket system that tracks changes through its Lotus Notes Database. This system ensures a central point for change requests and completions of such requests.

Recommendation 6: DOC should establish policies and procedures for monitoring, revoking, and changing employee access.

- **Management's Response:** The Department is developing a written policy to ensure these responsibilities are addressed. Due to the consolidation of IT staff to the Office of Technology services, employee access to CAJUN will be managed by Office of Adult Services staff and monitored and updated on a monthly basis, for separations and transfers.

Recommendation 7: DOC should establish and follow policies and procedures for making and monitoring changes to CAJUN.

- **Management's Response:** Currently change requests are made using a help ticket through the Lotus Notes Database, which submits the requests to OTS staff. The DPS&C will work with OTS staff to develop a written policy that encompasses the currently utilized help ticket system.

**Finding #5: DOC spent $3.6 million on a new data system which was supposed to have allowed for better tracking of offenders. However, the system failed due to inadequate planning and testing.**

Beginning in July 2012, DPS&C-CS contracted with METHODS Technology to develop a new Offender Management System (OMS) The new OMS would replace CAJUN and integrate its data and the Probation and Parole's Case Management System (CMS) data into one consolidated system. The goal of the OMS project was to address problems with CAJUN and allow for more efficient tracking of offender data.

As the audit states, the system was rolled prior to sufficient testing of the system. During the system development/programming stage of the project, the Department experienced several issues with the IBM software that was used for the development of the system. The issues with the software were not specific to DPS&C-CS and in fact affected other users of the software on a global scale. Concurrent with the software challenges, DPS&C-CS experienced turnover in its Project Manager and Lead Programmer positions. These problems caused serious delays in the development timeline and with the contract set to expire on June 30, 2015, with no ability to extend the contract, the system was rolled out on June 15, 2015.

The system went live on June 15, 2015 and was taken off-line on July 30, 2015. During this time, the OMS experienced a multitude of performance issues. Users were not able to complete workflow processes, data was not located in the appropriate location, and a multitude of tasks were assigned to users that had no part in the workflow. During this time, the Department struggled to address the issues as they arose, but it became evident that no level of effort was going to be sufficient to overcome the performance issues of the system. As such, the system was taken offline on July 30, 2015. DPS&C-CS reverted back to the CAJUN system and CMS.

After the failed launch of the system, DPS&C-CS in partnership with the Office of Technology Services (OTS) Project Management group began an effort to identify all the issues, formulate a plan to address and fix the problems, and to formulate a timeline for the re-launch of the OMS. Progress was made along this front, however, due to a significant budget shortfall, OTS was not able to provide the resources necessary to continue this effort. By way of background, during the consolidation of the numerous in-scope State Agencies' Information Technology Services into the Office of Technology Services within the Division of Administration, the previous administration identified "efficiencies" for reduction. In the case of DPS&C-CS, these "efficiencies" include an arbitrary reduction in $2.5 Million in the funding used to pay OTS for their services. This reduction was the catalyst for OTS to remove its resources from working on the re-launch of OMS in early 2016. In fact, this funding gap continues to be a problem and causes the Department to continually be in a deficit position and seek supplemental funding at the end of each fiscal year in order to pay the amount owed to OTS. **As of October, 2017, the Department and OTS have entered into a contract with a vendor to test the system to determine if it is salvageable with a start date of October 23, 2017.**

**Recommendation 8:** DOC should work with the Office of Technology Support (OTS) to develop a formal plan for determining whether the system is salvageable.

- **Management's Response:** The Department and the Office of Technology Services concur with these recommendations. The Department is working with OTS to determine if the system is salvageable. As noted above, as of October, 2017, the Department and OTS have entered into a contract with a vendor to test the system to determine if it is salvageable with a start date of October 23, 2017

**Recommendation 9:** If the system is determined salvageable, DOC and OTS should develop a detailed plan for the project to include proper design, development, testing, data conversion, user involvement, resources, and training.

- **Management's Response:** Pursuant to the determination noted above about the ability to salvage the system, the Department will coordinate with OTS to develop a plan for the future resumption and development of the OMS. Any future development will be coordinated through OTS's Project Management division.

In closing, the Department appreciates the efforts of you and your staff. I would like to thank you for the professionalism demonstrated by your staff and the thoroughness of their audit.

Sincerely,

James M. Le Blanc
Secretary

Attachments:
1. Time Computations Instructions
2. B-04-001 "Sentence Computation and Good Time Credits",
3. B-04-003 "CTRP Earned Credits"
4. B-04-004 "Determination of Offender Class and Computation of PAR Eligibility"
5. B-04-006 "Restoration of Good Time"