**EXHIBIT 15**

A brief from    T H E **PEW** C H A R I T A B L E   T R U S T S     |   Oct 2014

# Reducing Incarceration for Technical Violations in Louisiana

## Evaluation of revocation cap shows cost savings, less crime

## Overview

In 2007, Louisiana lawmakers unanimously approved legislation that set a 90-day limit on the incarceration in jail or prison of those whose probation or parole has been revoked for the first time for violating the rules of their community supervision.[1] Lawmakers passed the legislation, Act 402 (House Bill 423), to prioritize jail and prison beds for serious offenders and steer lower-level offenders to less expensive and potentially more effective alternatives.

An independent evaluation of the policy commissioned by The Pew Charitable Trusts, supplemented by additional research conducted by Pew, concluded that Louisiana's 90-day revocation limit has:

- Reduced the average length of incarceration for first-time technical revocations in Louisiana by 281 days, or 9.2 months.
- Maintained public safety, with returns to custody for new crimes declining from 7.9 percent to 6.2 percent, a 22 percent decrease.
- Resulted in a net savings of approximately 2,034 jail and prison beds a year.
- Saved taxpayers an average of $17.6 million in annual corrections costs.

This brief summarizes these findings and looks ahead to the longer-term implications of Act 402 for Louisiana.

Figure 1

## Revocation Cap Shows Strong Initial Results

Technical violators in Louisiana spend less time incarcerated and have fewer returns to custody

**Less time served**
**9.2** months

**Fewer new-crime revocations**
**22**%

**Saved corrections costs**
**$17.6** million

Source: Analysis of data from the Louisiana Department of Public Safety and Corrections, Louisiana Budget and Cost Data Summary, fiscal year 2013

© 2014 The Pew Charitable Trusts

# 1 in 55

Louisiana has long had the highest incarceration rate of any state. In 2008, when the national rate surpassed **1 in 100** adults for the first time, Louisiana's reached **1 in 55.**

## Background

Louisiana has long had the highest incarceration rate of any state. In 2008, when the national rate surpassed 1 in 100 adults for the first time, Louisiana's reached 1 in 55.[2] In the two decades between 1990 and 2010, the state's prison population doubled and corrections costs tripled.[3]

Among the factors driving this growth was the incarceration of offenders who had technical violations of their probation or parole.[4] In response, the state passed Act 402, which took effect Aug. 15, 2007, and imposed a maximum of 90 days behind bars for nonviolent, non-sex offender probationers and parolees who are revoked for the first time for violating the terms of their community supervision.[5] The law does not apply to offenders whose violations involve violence, possession of a firearm, or absconding from probation or parole supervision; or to offenders who have a previous revocation to custody for supervision violations. In addition, it directs the Division of Probation and Parole to focus on the rehabilitation needs of offenders by providing intensive substance abuse treatment and other recidivism reduction programs.

## Evaluation

In 2014, Pew commissioned an evaluation of the corrections savings and public safety effects of Act 402 during the law's first five years.[6] Conducted by Avinash Bhati of the analytical consulting firm Maxarth LLC, the analysis compared one-year follow-up outcomes of technical violators revoked to jail or prison after passage of Act 402 to similar offenders released before the law was enacted. Maxarth compared the periods of incarceration for first technical revocations and misconduct rates in the year following release for both groups.

The Act 402 group consisted of 11,655 offenders released between September 2007 and April 2012 who had served up to 90 days in jail or prison for their first technical revocation.[7] This group included only those who had spent at least one year in the community, the follow-up period, to allow researchers to track the commission of new crimes or subsequent technical violations after release.

The comparison group consisted of 13,789 offenders released from jail or prison between January 2000 and August 2004, before Act 402, following their first technical revocation.  The group included only nonviolent, non-sex offenders to allow for a more direct comparison with those subject to Act 402.

# Key findings

The analysis adds to a growing body of evidence that long periods of incarceration for revocations after technical violations contribute to higher corrections costs but do not reduce crime.

## Act 402 substantially shortens jail and prison stays

The average length of incarceration after an offender's first technical revocation in Louisiana declined by 281 days, or 9.2 months, as a result of Act 402. Offenders incarcerated for their first technical revocation before enactment of the law spent an average of 355 days in custody, compared with 74 days on average for those subject to the measure.



Figure 2

## Revocation Cap Maintains Public Safety

Act 402 offenders are less likely to return to custody for a new crime but have more technical revocations

Note: The between-group difference is statistically significant for new crimes (t = 5.19, p < .001)  and for technical violations (t = 6.01, p < .001).

Source: Analysis of data from the Louisiana Department of Public Safety and Corrections

© 2014 The Pew Charitable Trusts

■ Technical revocation
■ New crime

## After Act 402, revoked offenders are less likely to return to custody for new crimes

Offenders revoked for their first technical violations under Act 402 were less likely to return to prison or jail for new crimes within one year of their release than similar offenders who faced considerably longer periods of incarceration for a first technical revocation before Act 402. Returns to custody decreased from 7.9 percent to 6.2 percent, a 22 percent difference.

The groups displayed similar overall rates of misconduct, which includes new crimes as well as technical violations. However, the Act 402 group was 12 percent more likely to be returned to custody for a technical revocation.

Act 402 offenders committed more technical violations, but this may be because they were subject to probation or parole supervision for more of the one-year follow-up period. Offenders in the Act 402 group spent a maximum of 90 days in jail or prison before returning to community supervision for the remainder of their sentences. By contrast, the comparison group spent nearly one year in jail or prison, reducing their time under community supervision during the follow-up period.

## Act 402 saves bed space and corrections costs

An estimated 2,640 offenders annually were eligible for the 90-day cap under Act 402. Taking into account subsequent technical violations or new crimes that resulted in some offenders returning to incarceration, the law still significantly reduced Louisiana's use of jail and prison beds.



Figure 3

Revocation Cap Saves Jail and Prison Beds, Corrections Costs

Act 402 offenders spend less time incarcerated than the pre-402 group

Annual estimated Act 402 offenders
**2,640**

Average days of prison and jail beds saved
**281**

Total annual prison and jail beds saved
**2,034**

Prison and jail savings (fiscal 2013)
**$17.6** million

Source: Analysis of data from the Louisiana Department of Public Safety and Corrections, Louisiana Budget and Cost Data Summary, fiscal year 2013

© 2014 The Pew Charitable Trusts

On an annual basis, the act reduced the Louisiana Department of Public Safety and Corrections jurisdictional population by 2,034 beds. Because Louisiana holds a high share of the inmates for which the state has responsibility in local parish jails, the vast majority of these beds (2,007) were in jails rather than state facilities.

Pew measured the fiscal impact of Act 402 by considering the Louisiana Budget and Cost Data Summary for fiscal year 2013.[8] The average annual cost to the state of housing an offender in a local jail is $9,297; $14,501 in a state prison. Supervising an offender in the community through probation and parole costs an average of $704 a year.

Using the estimated annual corrections savings, and accounting for the costs of supervising those offenders in the community, Act 402 saved taxpayers approximately $17.6 million in corrections costs each year since 2007.[9]

## Policy implications

The evaluation of Act 402 provides additional evidence that reductions in prison time for certain offenders can maintain or even improve public safety while reducing public spending on corrections. The analysis concludes that offenders revoked for the first time under Act 402 spent significantly less time behind bars and were less likely to return to prison for committing a new crime than those first revoked before passage of the act.

Since adopting Act 402 in 2007, Louisiana has taken additional steps to improve outcomes for offenders on community supervision. In 2011, the state authorized probation and parole officers to impose administrative sanctions for technical violations (e.g., community service, residential treatment, house arrest), mandated training in evidence-based practices for parole board members, and required that every parole-eligible offender undergo a risk and needs assessment that the parole board would use in its decisions.[10] Additional policy measures and reinvestment of prison and jail savings into proven supervision strategies could further improve offender accountability and cut additional costs while continuing to reduce Louisiana's highest-in-the-nation incarceration rate.

> Act 402 provides additional evidence that reductions in prison time for certain offenders can maintain or even improve public safety while reducing public spending on corrections.



Louisiana State Capitol Building

## Endnotes

1    "First-time technical revocations" refers to the first formal breach of conditions of community supervision—such as mandated treatment, abstinence from drugs, and reporting requirements—filed by probation or parole officers.

2    The Pew Charitable Trusts, *One in 31: The Long Reach of American Corrections* (March 2009), http://www.convictcriminology.org/pdf/pew/onein31.pdf.  This figure includes Louisiana adults incarcerated in state and federal prisons and local jails.

3    Nancy LaVigne et al., *Justice Reinvestment Initiative State Assessment Report*, Urban Institute (January 2014), http://www.urban.org/UploadedPDF/412994-Justice-Reinvestment-Initiative-State-Assessment-Report.pdf.

4    LaVigne et al., *Justice Reinvestment Initiative State Assessment Report*.

5    Louisiana Regular Session, Act No. 402 (2007), http://www.legis.la.gov/legis/ViewDocument.aspx?d=450052&n=HB423%20Act%20402.

6    Pew's supplemental analysis converted bed-space savings to cost savings.

7    Data from September 2005 to August 2007 were excluded for two reasons: A similar policy (Act 113) was enacted in August 2006 that affected only probationers, so the period from August 2006 through August 2007 was excluded to prevent confounding the results. Hurricane Katrina made landfall in Louisiana on Aug. 29, 2005. Initial analysis showed a significant drop in technical violations after that event, but this drop was due to data disruptions that did not return to normal levels until two years later (about August 2007).

8    Louisiana Department of Public Safety and Corrections, *Budget and Cost Data Summary FY 2013-2014* (July 2013).

9    These savings align with the Louisiana Department of Public Safety and Corrections' estimate described in its fiscal 2009 Annual Report (Louisiana Board of Pardons and Parole, *Annual Report 2012* [2012], 22, http://www.doc.la.gov/wp-content/uploads/2014/05/2012-Annual-Report-Pardons-and-Parole-Revised-May-2014.pdf). "A rough estimate of the saving in tax dollars attributable to Act 402 can be easily calculated: 2000 offenders times 420 days saved, times $25 a day, equals over $20,000,000." The department's estimate is higher than our cost assessment because it does not differentiate between the costs of jail beds and prison beds and does not discount the additional cost of probation or parole supervision.

10   LaVigne et al., *Justice Reinvestment Initiative State Assessment Report*.

## Acknowledgments

The Pew Charitable Trusts' public safety performance project would like to thank Avinash Bhati, Ph.D., of Maxarth LLC for conducting the analysis for the study, and to acknowledge as external reviewers the contributions of Shawn M. Flower, Ph.D., principal and founder of Choice Research Associates; and Brian D. Johnson, Ph.D., associate professor and director of graduate studies in the Department of Criminology and Criminal Justice at the University of Maryland. Support for this brief was provided by Pew staff members Kathryn Zafft, John Gramlich, Adam Gelb, and Darienne Gutierrez, and by former staff member Karla Dhungana Sainju. We would also like to thank Jennifer V. Doctors and Kristin Centrella for editing and design, respectively.

**For further information, please visit:**
pewtrusts.org/publicsafety

**Contact:** Christina Zurla, communications manager
**Email:** czurla@pewtrusts.org
**Project website:** pewtrusts.org/publicsafety

**The Pew Charitable Trusts** is driven by the power of knowledge to solve today's most challenging problems. Pew applies a rigorous, analytical approach to improve public policy, inform the public, and invigorate civic life.