UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BRIAN McNEAL

CIVIL ACTION

VERSUS

NO. 18-736-JWD-EWD

LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS, ET AL.

RULING AND ORDER

This matter comes before the Court on two dispositive motions: (1) *Plaintiff's Motion for Partial Summary Judgment on Fourteenth Amendment Claim* (Doc. 134) ("*PMPSJ*") filed by Plaintiff Brian McNeal ("Plaintiff" or "McNeal"); and (2) the *Motion for Summary Judgment* (Doc. 138) ("*DMSJ*") filed by Defendants Louisiana Department of Public Safety and Corrections ("DPSC" or "DOC"); Secretary James LeBlanc; and Breunkia Collins (collectively, "Defendants").[1] Both motions are opposed, (Docs. 136, 140), and each side has filed replies, (Docs. 137, 141). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, both motions are denied.

I.    RELEVANT BACKGROUND

This case is about an overdetention, "now a euphemism for prisoners illegally incarcerated beyond the terms of their sentence." *Hicks v. LeBlanc*, 81 F.4th 497, 500 (5th Cir. 2023) ("*Hicks II*"). (Doc. 1-2.) As the Fifth Circuit said in *Hicks II*, "We are seeing [these claims] with some

---

[1] The Court notes that Collins joined in this motion, but, after it was filed, Collins died. (*See* Doc. 152.) Shorronda Plain is her representative and has substituted in her place. (*Id.*) Throughout this ruling, the Court will continue to refer to Collins as the defendant for simplicity's sake.

frequency . . . . Unfortunately, many of these cases have come to this Court in recent years. This is yet another from Louisiana." *Id.*

In 2015, Brian McNeal pleaded guilty to possessing cocaine and drug paraphernalia. (*Defs. Stat. of Undisputed Facts* ("*DSUF*") ¶ 10, Doc. 138-2.)[2] He received a five-year suspended sentence with supervised probation, mental health court observations, and other court-ordered conditions. (*Id.*) In August 2017, the Court revoked McNeal's probation and, consistent with Louisiana law, sanctioned him to 90 days of treatment at the Steve Hoyle Program. (*Id.*)

McNeal was assigned initially to Elayn Hunt Correctional Center ("Elayn Hunt") for intake and screening. (*Id.* ¶ 11.) At that time, Probation and Parole officers prepared a letter as "authority to release the offender [McNeal] on 11/01/2017." (*Id.*)

It is undisputed that Defendant Breunkia Collins, an investigative specialist with DOC, mailed the letter to Hoyle, (*id.*), but what is hotly disputed is what other role Collins had in this process. Defendants contend that Collins merely sent the letter and did nothing else; therefore, Defendants argue, Collins was not negligent. (*See* Doc. 138-1 at 21.) On the other hand, as will be explored below, Plaintiff submits evidence that (1) Collins sent this letter even though she knew that, on that day, McNeal was physically in Orleans Parish Prison, (Collins Dep. 32, Doc. 140-6); (2) that Collins also knew that McNeal's transfer from prison to the Steve Hoyle Program was canceled by the Elayn Hunt medical department, (Doc. 138-10; Collins Dep. 36, Doc. 140-6; Ellis Dep. 28, Doc. 140-7); (3) that she knew "[i]t could be a problem" for McNeal's paperwork to be at one prison while he was at another, (Collins Dep. 36, Doc. 140-6); and (4) that, even though it

---

[2] When a paragraph of the *DSUF* is cited alone, then that fact has either been admitted in the Plaintiff's *Opposition to [DSUF]* ("*POSUF*"), Doc. 140-1, or it has been qualified or denied in such a way as to have it be deemed admitted as not properly controverted. *See* M.D. La. Civ. R. 56(c), (f).

was her responsibility to remedy the problem, (Milligan Dep. 40–41, Doc. 140-5), she took no steps to do so, (*See* Ellis Dep. 29–30, Doc. 140-7.)

In any event, McNeal was released from Elayn Hunt on December 12, 2017—41 days after his November 1, 2017, release date. (*DSUF* ¶ 14, Doc. 138-2.) This happened despite the fact that McNeal wrote the warden on November 1, 2017, advising the warden that he should be released. It happened despite the fact that his girlfriend did the same by telephone on December 6, 2017. (*See* Doc. 12-5; Doc. 12-6 at 4.) And it happened despite the fact that the DOC was made aware of McNeal's overdetention on December 8, 2017. (Doc. 12-4 at 3–4.)

All of this led this Court to grant McNeal's *Motion for Summary Judgment on False Imprisonment Claim* (Doc. 56). This Court held: "There is no genuine dispute as to any material fact regarding the elements of false imprisonment. Both parties agree that Mr. McNeal was imprisoned at the [Elayn Hunt] for 41 days following his correct release date." (*Id.* at 14.) Plaintiff also brought claims of state law negligence against DOC, LeBlanc, and Collins, which the Court will now take up. (*See Second Am. Compl.* ¶¶ 190–94, Doc. 91.)

Plaintiff also brought claims against LeBlanc under 42 U.S.C. § 1983, including under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and for failure to train and supervise. (*Second Am. Compl.* ¶¶ 195–97, 201–232, Doc. 91.) In sum, Plaintiff claims that LeBlanc discovered in 2012 that the DOC was holding thousands of inmates past their release dates each year because of LeBlanc's policies and practices; that this pattern continued well into 2017; that LeBlanc knew about the problem; that, despite this knowledge, he failed to make timely release a DOC priority or practice; and that these policies and practices directly caused overdetentions for people like McNeal. (*Id.* ¶¶ 52–183.) Thus, LeBlanc was aware of and/or utilized widespread practices which amounted to *de facto* policies, which were allowed to exist

3

because of LeBlanc's deliberate indifference, and which were the driving force behind the constitutional violations McNeal suffered. (*Id.* ¶¶ 201–03.)

After the Court found that Plaintiff stated a viable § 1983 claim against LeBlanc (Doc. 110), LeBlanc appealed the ruling to the Fifth Circuit, (Doc. 111). As will be explored below, the Fifth Circuit affirmed this Court's decision. *See McNeal v. LeBlanc*, 90 F.4th 425 (5th Cir. 2024) (per curiam), *cert. denied*, No. 24-19, 2024 WL 4427170 (U.S. Oct. 7, 2024). As will also be explored below, this decision came amidst an ever increasing chorus of decisions denying LeBlanc qualified immunity. *See Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 90 (2023); *Parker v. LeBlanc*, 73 F.4th 400 (5th Cir. 2023); *Hicks II*, 81 F.4th 497; *Buchicchio v. LeBlanc*, No. 23-30116, 2024 WL 4603272 (5th Cir. Oct. 29, 2024) (per curiam).

Both parties now move for summary judgment. *DMSJ* seeks dismissal of all of Plaintiff's claims. (Doc. 138.) Defendants advance three main arguments. (Doc. 138-1 at 2.) First, LeBlanc is entitled to qualified immunity because (a) he trained the employees who processed McNeal's probation revocation; (b) the training did not cause McNeal to be "overdetained;" and (c) LeBlanc was not deliberately indifferent. (*Id.*) Second, McNeal's claims are *Heck*-barred. (*Id.*) And, third, the state law claims should be dismissed. (*Id.*)

Conversely, in his motion, Plaintiff asks the Court to grant partial summary judgment on his federal constitutional claim against LeBlanc. (Doc. 134.) Plaintiff summarizes the *PMPSJ* as follows:

> Plaintiff's motion follows a simple syllogism:
>
> 1. The Fifth Circuit held that "overdetention by thirty days is a per se deprivation of due process."
>
> 2. The Fifth Circuit held that "LeBlanc has a duty to ensure inmates are timely released from prison."

4

3. This Court previously determined that "Mr. McNeal was held for 41 days past his legal release date."

4. Therefore, Mr. McNeal was subject to a deprivation of due process by LeBlanc.

(Doc. 137 at 1.)

## II. RELEVANT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving

> party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

"Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law." *Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

Additionally, "cross-motions [for summary judgment] must be considered separately and should not be interpreted necessarily to mean that judgment should be entered on one of them[.]" 10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2720 (4th ed. 2022). This is because "each party, as a movant for summary judgment, bears the burden of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law." *Id*.

> The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion. The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a

> judgment may be entered in accordance with the Rule 56 standard. Both motions must be denied if the court finds that there is a genuine dispute of material fact. But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

*Id.*

## III.    DISCUSSION: SECTION 1983 AND QUALIFIED IMMUNITY

### A. Parties' Arguments

#### 1. *Defendants' Memorandum in Support of* **DMSJ** *(Doc. 138-1)*

Defendants begin by asserting that McNeal was not "sentenced to prison;" he was, they say, "sanctioned" for violating his probation with a 90 day-stay at a substance abuse treatment center under Act 402. (*Id.* at 13.) However, LeBlanc established policies and trained employees to process Act 402 revocations. (*Id.* at 13–14.) To support his inadequate training claim, Plaintiff relies on other cases—*Crittindon*, *Hicks II*, and *Parker*—but these cases involve the Pre-Classification Department training; none of these cases "say[ ] anything of Act 402 probation revocations for placements in substance abuse treatment centers or the Probation and Parole Department that processes them." (*Id* at 14.) "McNeal cannot point to evidence (let alone allegations) that Secretary LeBlanc failed to train *different* employees to perform a *different* function that has nothing to do with processing McNeal's Act 402 revocation. And if relevant, that is flat wrong" because there is evidence that these employees were properly trained. (*Id.* at 14–15.)

LeBlanc is also entitled to qualified immunity, Defendants maintain, because the training did not cause the overdetention. (*Id.* at 15–16.) Defendants assert:

> McNeal's detention beyond November 1 resulted from (1) his denial from the Hoyle program for health reasons, (2) the release letter being sent before his denial; and (3) the state court's follow-up

7

> hearing suggesting that McNeal remain in DPSC custody until a "long-term" substance abuse treatment option was available.
>
> None of those causes has *anything* to do with Secretary LeBlanc or his trainings.

(*Id.* at 15.) Here, LeBlanc had training in place, which is reflected by the fact that McNeal was released less than a day after his attorney notified Elayn Hunt staff of the problem. (*Id.* at 15–16.)

On deliberate indifference, Defendants contend that there is a lack of any pattern of similar constitutional violations. (*Id.* at 16.) Plaintiff points to a pattern based on the 2012 Lean Six Sigma Study, a 2017 Legislative Audit Report, and the 2019 grant application, but all these involve Pre-Classification Department employees and their time computation functions, *not* Act 402 revocations. (*Id.* at 16–17.) Defendants then look at each of these individual pieces of evidence:

(a) *Lean Six Sigma Study*: This case doesn't involve the same type of errors identified by the that study, and, in any event, LeBlanc "implemented *every recommendation*" in it, worked for legislation to minimize the problem, and "acted upon the Louisiana Supreme Court's call to close the gaps between DPSC and state criminal courts for precisely these issues." (*Id.*)

(b) *Legislative Audit Report*: This document was issued a week before McNeal's alleged release date, so, Defendants say, it could not have provided adequate notice of the need to adjust the training. Aside from that, again, it concerned Pre-Classification Department processes for calculating release dates for sentenced inmates, not Act 402 probation violators.

(c) *2019 Grant Application*: This "was issued in 2019—two years too late," and LeBlanc was not aware of these findings until he read it in 2019. And, again, it's not an Act 402 situation.

(*Id.* at 17–18.)

Defendants next contend that Plaintiff failed to provide any summary judgment evidence to support his supervisory liability claim. (*Id.* at 18.) Plaintiff runs afoul of the Fifth Circuit's prohibition on *respondeat superior* liability by insisting that there is per se liability for overdetentions beyond thirty days, as shown in *Crittindon* and another Fifth Circuit case. (*Id.* at

18–20.) In short, overdetention beyond thirty days is not enough, by itself, to impose liability on LeBlanc. (*Id.* at 20.) Additionally, Plaintiff must submit summary judgment evidence to support his claim, which he fails to do. (*Id.*)

### 2. *Plaintiff's Opposition to* DMSJ *(Doc. 140)*

Plaintiff begins by quoting the Court's ruling on a prior summary judgment motion: "McNeal was held for 41 days past his legal release date." (Doc. 140 at 1 (quoting Doc. 56 at 3).) Plaintiff then asserts that "most of Defendants' key arguments – the relevant scope of the over-detention problem, LeBlanc's knowledge of it, and the *Heck/Preiser* doctrine – have already been assessed and rejected by the Fifth Circuit." (*Id.*) Consequently, *DMSJ* should be denied. (*Id.*)

First, though Defendants argue that the broader overdetention patterns in *Crittindon*, *Hicks*, and *Parker* don't apply here because McNeal's case involves Act 402 revocations, the Fifth Circuit rejected that argument in this case and others. (*Id.* at 1–2.) This is the law of the case, and "LeBlanc cannot keep pressing it." (*Id.* at 2.) Defendants maintain that McNeal was not "sentenced" but rather "sanctioned," but, if that's true, it was unlawful to hold McNeal for <u>any</u> of the 131 days he was in prison. (*Id.*) Thus, if the Court makes this finding, it should expand the scope of its ruling on the false imprisonment claim. (*Id.*)

Second, Plaintiff says there is a "staggering volume" of evidence showing deliberate indifference. (*Id.*) Plaintiff again looks to the Fifth Circuit's decision in *McNeal*, which highlighted the following: (1) "LeBlanc knew about the October 2017 legislative audit." (2) "[T]estimony by DPSC employees in *Chowns v. LeBlanc*, La. 37th JDC 26-932, admitting to rampant overdetention." (3) "LeBlanc had intimate knowledge about the results from the Lean Six Sigma report before McNeal's overdetention occurred." and (4) "[B]efore 2017, multiple public officials

9

reached out to LeBlanc regarding overdetained prisoners." (*Id.* at 3–4.) Plaintiff then points to evidence supporting each of these facts. (*Id.*)

But, this is "only a fraction of the total evidence of the over-detention pattern and LeBlanc's deliberate indifference to it," as explained by Judge Feldman in another case. (*Id.* at 4 (citing *Traweek v. Gusman*, 2021 U.S. Dist. LEXIS 10198, at *11 (E.D. La. Jan. 20, 2021), *appealed and remanded for consideration in light of Crittindon*).) Plaintiff relies on the finding of the Six Sigma study and LeBlanc's poor response to it. (*Id.* at 4–5.) DPSC also had a voicemail which said that it takes at least 90 days after sentencing to calculate the time served. (*Id.* at 6.) Further, there was no formal training program for time computation staff, only people working ad hoc. (*Id.*) Plaintiff then catalogs other evidence from 2014 to 2017 evidencing LeBlanc's continued failure to deal with the problem of overdetention. (*Id.* at 6–7.) LeBlanc also rejected help from the Louisiana Clerks of Court Association for expediting release dates on the grounds that it would "cause more work for [DOC]." (*Id.* at 7.) LeBlanc conceded that, five years after the Six Sigma project, over-detention was still a problem. (*Id.* at 8.) Plaintiff also cites the 2017 Legislative Auditor's report, which came out a month before McNeal's overdetention and which found a number of problems with DPSC. (*Id.* at 8.) Another example is the DPSC's own 2017 internal investigation which confirmed that the pattern of overdetention dating back to 2012 was ongoing. (*Id.*) Further, the DPSC completed a grant application in 2017 to the U.S. Department of Justice which also discussed the problem. (*Id.* at 8–9.)

The DPSC also used inadequate technology to deal with the issue. (*Id.* at 9.) The department tested a new system in 2015, but (a) it "never went into full production," and (b) consequently, at the time of McNeal's overdetention, the "functional processes" for transmitting documents were "as antiquated as they were in 1996." (*Id.* (quotations omitted).) Plaintiff cites to

one incident in 2016 when 150 DPSC inmates were transferred to the East Carroll facility "without paperwork," causing several inmates to be held for over 90 days after their release date. (*Id.* (citing *Crittindon*, 37 F.4th at 184).)

LeBlanc knows of no other state dealing with a overdetention problem of this magnitude. (*Id.*) He has not discussed the issue with the heads of other state department of corrections, "aside from looking at what software they use." (*Id.* at 9–10.)

LeBlanc testified about one thing that might mitigate the problem of overdetention: having DPSC "actually go out and get the paperwork" instead of waiting for clerks and sheriffs to bring them. (*Id.* at 10.) However, (a) DPSC never did that under LeBlanc, and (b) he did not try, without explanation, to set a timeframe for sheriffs to submit the documents to DPSC, until 2023—six years after McNeal's overdetention. (*Id.*)

Plaintiff also analogizes to the state employee retirement system; with that, the state—without complaint—"has to keep careful track of how long DPSC employees have worked, what their salary was, and other factors so that the state can calculate what sort of benefits they're eligible for upon retirement." (*Id.*) Thus, the state can keep track of time, apply formulas, and do so in a correct and orderly way, all without complaint, but they have not done so here. (*Id.*)

LeBlanc also had master plans for DOC from 2008 to 2019, and, while these plans set goals in certain areas, no written goal dealt with fixing the overdetention problem. (*Id.* at 10–11.)

In sum:

> LeBlanc (1) knew about a widespread problem of over-detention; (2) did not set a goal of fixing it; (3) did not take the steps necessary to fix it; and (3) refused help when offered. A small subset of these facts led the Fifth Circuit in *Crittindon* to uphold the denial of qualified immunity to LeBlanc at the summary judgment stage. The Fifth Circuit held that LeBlanc was "keenly aware of the flaws of the system that failed to timely release prisoners." A reasonable jury could similarly conclude here. The motion should be denied.

(*Id.* at 11.)

Turning to Defendants' next argument (causation), Plaintiff first notes that it is "unclear why [LeBlanc] only addresses 'training,' given that this Court recognized that Plaintiff's theory is broader than that" and included "policies, training, and supervision." (*Id.* (quoting Doc. 110 (order denying motion to dismiss)).) In any event, "the reason why McNeal was over-detained was that his release paperwork and his body were sent to two different facilities." (*Id.* at 11–12.) DPSC employees like Collins knew that and that there was a problem and did not remedy it. (*Id.* at 12.) Then, employees ignored McNeal's letters and his girlfriend's alerting them there was problem. (*Id.*)

> A reasonable jury could conclude that such across-the-board indifference to McNeal's liberty, in which multiple DPSC employees were aware of the problem and took no steps or slow steps to remedy it, flowed from LeBlanc's supervision. The jury could conclude that LeBlanc's choices – to never set any goals to eliminate over-detention and to never punish any employee who caused overdetention – led to the result that solving over-detention was an extremely low priority for DPSC staff. The motion should be denied.

(*Id.*)

Plaintiff also makes an impassioned plea based on "recent scholarship" that the Court should reject the doctrine of qualified immunity as contrary to the original text of Section 1983. (*Id.* at 16–24.)

Finally, Plaintiff contends that Defendants' motion should be denied because three of Defendants' material facts are in dispute—specifically, facts No. 4, 12, and 13—and all are "highly relevant to deliberate indifference." (*Id.* at 24.) For example, No. 4 states that Defendants created "a new computer system to replace CAJUN," but the evidence shows that it was tested but never

implemented and that, at the time of McNeal's overdetention, the "functional processes" around the transmission of documents were "as antiquated as they were in 1996." (*Id.* (quotation omitted).)

### 3. Defendants' Reply Memorandum in Support of DMSJ *(Doc. 141)*

Defendants reply first that Plaintiff cannot just rest on the ruling at the motion to dismiss phase; rather, Plaintiff must come forward with evidence to substantiate the allegations. (Doc. 141 at 3.) Here, the Fifth Circuit noted several times in *McNeal* and *Parker* that its rulings were based on the pleadings, not an evidentiary record. (*Id.* at 4.) Thus, the law-of-the-case argument fails. (*Id.*)

Next, Defendants again hammer the differences with Act 402 revocations like McNeal's. (*Id.*) The evidence shows that LeBlanc provided adequate training. (*Id.* at 4–5.)

Defendants then turn to deliberate indifference, urging that there must be a pattern of *similar* violations. (*Id.* at 5.) All of McNeal's evidence relates to time computations controlled by the Pre-Classification Department, not any employee involved in Act 402 revocations. (*Id.* at 5–6.) "But the logical question follows: *What does that have to do with McNeal?*" (*Id.* at 7.)

Further, "LeBlanc was far from indifferent." (*Id.*) Defendants assert:

> The record is now clear (and undisputed): Secretary LeBlanc implemented recommendations in the [Lean Six Sigma] study. He centralized the DPSC Pre-Classification Department, worked with the Louisiana Supreme Court and local facilities to streamline communications, spent millions in creating a new system to replace Cajun, implemented a digital filing system and standardized pre-classification and time computation procedures. Opp. SUF at 1–2; Doc. 138-4, p. 27. Secretary LeBlanc also chaired the 2016 Louisiana Justice Reinvestment Task Force that led to an additional 34% reduction in Louisiana's prison population. Opp. SUF at 1–2. In 2017, he worked with the Louisiana Supreme Court to update Louisiana's Uniform Commitment Order to pass legislation "to improve communication between the sentencing judge and DPS&C." Opp. SUF at 2.

(*Id.* at 8.) McNeal's own evidence shows that LeBlanc set a goal for zero overdetentions, "identified that added layers of bureaucracy were slowing the process down and '"caus[ing] more work,'" and so "declined extra government cooks in the kitchen like UCOs." (*Id.*) LeBlanc also did not discourage family members from taking an "active role in ensuring timely releases." (*Id.*) LeBlanc concludes:

> To all of this, McNeal's disputed fact: The computer system "never went into full production"—i.e. for only 45 days—and the online portal was not in place until 2023. Opp. SUF at 2-3. Come on—that is not material to whether Secretary LeBlanc acted with unconstitutional indifference. *See Roe,* 53 F.4th at 341.

(*Id.* at 8–9 (cleaned up).)

Defendants finally urge that qualified immunity remains a viable defense under Supreme Court and Fifth Circuit precedent. (*Id.* at 9.) Only the Supreme Court can definitively overrule it. (*Id.*)

### 4.   *Plaintiff's Memorandum in Support of* **PMPSJ** *(Doc. 134)*

*PMPSJ* is straightforward: (1) The Court previously determined that McNeal was held 41 days past his legal release date; (2) The Fifth Circuit has held that an overdetention beyond thirty days is a per se deprivation of due process; (3) The Fifth Circuit has also said that LeBlanc is the person responsible for avoiding untimely release constitutional violations; and (4) Therefore, LeBlanc is liable for the constitutional violation in this case. (Doc. 134 at 1.)

### 5.   *Defendants' Opposition to* **PMPSJ** *(Doc. 136)*

Defendants begin by emphasizing that, in this case, the Fifth Circuit evaluated the sufficiency of Plaintiff's allegations when viewed in a light most favorable to him; now, at this stage, McNeal bears the evidentiary burden with the facts and inferences viewed in LeBlanc's favor. (Doc. 136 at 1.) On the merits, LeBlanc is entitled to qualified immunity because he was

not deliberately indifferent to any pattern of similar constitutional violations. (*Id.* at 1–2.) Defendants reiterate the arguments, outlined above, about the differences between Act 402 revocations and Pre-Classification, contending that all of Plaintiff's evidence relates to the latter and not the former. (*Id.* at 2.) In sum: "Summary judgment has changed the ballgame. The record has dispelled McNeal's allegations. The standard flips the evidentiary burden to McNeal. And the evidence now shows McNeal has no viable *Connick*-based claim against Secretary LeBlanc to overcome his entitlement to qualified immunity." (*Id.* at 2–3.)

Defendants then largely repeat arguments made in support of their *DMSJ*, including that (1) there is no underlying constitutional violation because (a) McNeal was not "sentenced" but rather "sanctioned for a probation violation" under Act 402, so the evidence of overdetention cited in *Crittindon*, *Hicks*, and *Parker* is irrelevant, (*id.* at 10–12); (b) "overdetention" is not a viable due process claim (though Defendants concede this is foreclosed by circuit precedent), (*id.* at 12); and (c) questions of fact preclude summary judgment, including that McNeal's release date extended beyond the December 12 release date, (*id.*); (2) even if there were a constitutional violation, it was not connected to LeBlanc because (a) "LeBlanc both supervised and trained the relevant subordinate officers in the relevant respect," (*id.* at 13), and any failures involved different, Pre-Classification Department employees, not Act 402 employees, (*id.* at 13–14); (b) any training deficiencies did not cause the overdetention violation, (*id.* at 14); and (c) LeBlanc was not deliberately indifferent, for all the reasons given above, (*id.* at 14–17); and (3) Plaintiff's claims are *Heck*-barred, (*id.* at 19).

Defendants also add that Plaintiff fails to show that LeBlanc is not entitled to qualified immunity because LeBlanc violated no clearly established law. (*Id.* at 17.) The Supreme Court

does not recognize a clearly established right based on circuit precedent alone, and the circuits are currently divided on whether there is an overdetention right. (*Id.* at 17–18.)

### 6. *Plaintiff's Reply in Support of* PMPSJ *(Doc. 137)*

Plaintiff responds:

> Plaintiff's motion follows a simple syllogism:
>
> 1. The Fifth Circuit held that "overdetention by thirty days is a per se deprivation of due process."
>
> 2. The Fifth Circuit held that "LeBlanc has a duty to ensure inmates are timely released from prison."
>
> 3. This Court previously determined that "Mr. McNeal was held for 41 days past his legal release date."
>
> 4. Therefore, Mr. McNeal was subject to a deprivation of due process by LeBlanc.

(Doc. 137 at 1.) "Instead of actually engaging with Plaintiff's motion, Secretary LeBlanc chooses instead to make an array of arguments that have been rejected by the Fifth Circuit." (*Id.*)

According to Plaintiff, the Fifth Circuit has long held that it is a per se violation to overdetain an inmate beyond thirty days. (*Id.* at 2–3.) LeBlanc's arguments that a "per se" rule is contrary to the law is without merit. (*Id.*) Further, LeBlanc fails to engage with the Fifth Circuit's holding in *Parker* that "the law is clear that a jailer like LeBlanc has a duty to ensure inmates are timely released from prison." (*Id.* at 3 (quoting *Parker*, 73 F.4th at 407).)

Further, LeBlanc has not sought a reconsideration of the Court's prior ruling that McNeal was held for 41 days past his release date. (*Id.*) Instead, LeBlanc now argues that McNeal was never sentenced at all but rather subject to a sanction for a probation violation. (*Id.*) But Louisiana law—specifically, La. Code Crim. Proc. art 900(6)(b–c)—provides otherwise. (*Id.* at 4.) In any event, the "more fundamental problem" with this position is that McNeal didn't go to a substance

abuse center; he was sent to prison for 131 days, so, if McNeal should never have been sent to jail, he was actually overdetained even longer than 41 days. (*Id.*) That is, even if Defendants are right, the overdetention was 131 days, not 41. (*Id.*)

On the second prong of qualified immunity, Plaintiff say Defendants are wrong; the Fifth Circuit has regularly looked to its own precedent to determine if a law is clearly established. (*Id.* at 5–6.) In fact, the Court did so in this case, and Defendants' failure to disclose that is inconsistent with their duty of candor to the Court. (*Id.* at 6–7.)

Other arguments—such as the Act 402 revocation and the *Heck* bar ones—have already been rejected by the Fifth Circuit *in this case*. (*Id.* at 7.) Indeed, Plaintiff cites twelve other cases in which this *Heck* position was lost, from the Fifth Circuit to this district to the Eastern District. (*Id.* at 8 (citations omitted).) Plaintiff says that "this now becomes a Rule 11 issue," and Defendants should be warned not to urge arguments that have been rejected. (*Id.*)

### B. Applicable Law

#### 1. *Qualified Immunity Generally*

"Qualified immunity shields government officials performing discretionary functions from civil damages liability 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Crittindon*, 37 F.4th at 185 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Determining whether an officer is entitled to qualified immunity requires a two-step inquiry." *Id.* "First, we ask whether the officer's alleged conduct has violated a federal right. Second, we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.* at 185–86 (cleaned up). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As to the second prong, "[i]n determining what constitutes clearly established law, [the Fifth Circuit] first looks to Supreme Court precedent and then to [its] own." *Crittindon*, 37 F.4th at 186 (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018)). "When there is no direct controlling authority, '[the Fifth Circuit] may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority." *Id.* (quoting *Shumpert*, 905 F.3d at 320 (internal quotation marks and citation omitted)). "Ultimately, the touchstone is 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Shumpert*, 905 F.3d at 321 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002))).

As to the first prong, "Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002). "A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). "'In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates.'" *Id.* (quoting *Gates*, 537 F.3d at 435 (internal quotation marks and citation omitted, alterations and emphasis in *Gates*)). *See also Crittindon*, 37 F.4th at 186, 188

18

(explaining how plaintiff must show supervisor was deliberately indifferent in direct participation cases or in cases involving failure to adopt policies).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (quoting *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). "'For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (en banc)). "'Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.'" *Id.* (quoting *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999)).

For failure-to-adopt policy claims, "Plaintiffs must introduce evidence that each Defendant had 'actual or constructive notice' that their failure to adopt policies would result in constitutional violations." *Crittindon*, 37 F.4th at 186 (quoting *Porter*, 659 F.3d at 447). "This typically requires showing notice of '[a] pattern of similar constitutional violations' due to deficient policies, permitting the inference that Defendants deliberately chose policies causing violations of constitutional rights." *Id.* (quoting *Porter*, 659 F.3d at 447).

### 2. The Overdetention Saga

Before applying this general law to the facts at hand, the Court finds it important to describe the evolution of the Fifth Circuit caselaw governing the overdetention crisis in Louisiana. Counsel

19

for both sides are intimately familiar with these cases. Nevertheless, these decisions will provide

context for this Court's ruling as well as support for it.

a.  The "Long Long Ago"

*Hicks v. LeBlanc*, 832 F. App'x 836 (5th Cir. 2020) ("*Hicks I*") captures its beginnings.

There, the appellate court concluded that Chief Judge Dick erred in denying LeBlanc qualified

immunity for overdetention. *Id.* at 838. The appellate court stated:

> Whether LeBlanc acted with deliberate indifference is a close call.
> Hicks alleged that LeBlanc knew of the DPSC's long history of
> over-detaining inmates; that DPSC employees used different
> methods to calculate release dates; and that the DPSC had not
> disciplined employees who miscalculated sentences. However, the
> alleged facts—which included processing delays, data errors,
> inconsistent calculation methodologies, and unspecified
> deficiencies—speak to the incompetence of DPSC employees and
> the lack of adequate training and supervision. Based on these
> allegations, LeBlanc could be held liable for incompetent over-
> detention, such as the failure to process a prisoner's release or
> immediately compute an inmate's sentence after being sentenced to
> time served. *See Traweek v. Gusman*, 414 F. Supp. 3d 847 (E.D. La.
> 2019); *Grant v. Gusman*, No. 17-2797, 2018 WL 3869494 (E.D. La.
> Aug. 14, 2018). But it cannot be said that LeBlanc had notice that
> his employees were purposely disregarding sentencing orders out of
> retaliatory intent. The complaint was devoid of allegations
> supporting the reasonable inference that a pattern of intentional
> over-detention existed in the DPSC; that is, the alleged facts suggest
> a pattern of over-detention caused by quality control deficiencies
> and the lack of training and supervision, not a pattern of over-
> detention stemming from the blatant refusal to credit offenders with
> time served contrary to sentencing orders. In the absence of such a
> pattern, LeBlanc could not have acted with deliberate indifference
> to Lawson's intentional sentencing miscalculation and over-
> detention of Hicks. Accordingly, the district court erred in denying
> LeBlanc's defense of qualified immunity.

*Id.* at 842.

b.  Crittindon v. LeBlanc

Then, a change came with *Crittindon*. There:

> Plaintiffs argue that Defendants were deliberately indifferent to their right to timely release by failing to adopt policies that would ensure local jails' timely transmission of pre-classification paperwork to DPSC; that all three officials knew that local jails were failing to timely send paperwork but did nothing, well aware that their policies (or lack thereof) led to overdetentions.

*Crittindon*, 37 F.4th at 186. Chief Judge Dick denied both parties' motions for summary judgment, and the DPSC defendants appealed the denial of qualified immunity. *Id.* at 185.

The Fifth Circuit affirmed as to LeBlanc's motion, finding that, when construing the evidence in a light most favorable to the plaintiffs, "a reasonable jury could find that Defendants [(including LeBlanc)] knew of a 'pattern of similar constitutional violations,' such that their inaction amounted to a disregard of an obvious risk." *Id.* at 187.

The Fifth Circuit relied on the DPSC's Lean Six Sigma study, which "revealed that 2,252 DPSC prisoners were annually held past their release date. On average, these prisoners were detained 72 days past the expiration of their court-imposed sentence." *Id.* The Court continued,

> The study attributed this overdetention to delays in determining prisoners' release dates, finding that on average, it took 110 days to determine a prisoner's release date after his conviction. This included approximately 31 days for documents to be transmitted from the Clerk of Court to the local jail to DPSC's Pre-Classification Department.

*Id.* The appellate court noted that LeBlanc was "familiar with the Lean Six Sigma study" and "was a 'champion' of the project and apprised of its findings." *Id.* The appellate court continued:

> Defendants concede that, because of the study, they each knew that on average, it took a month for DPSC to receive the paperwork necessary to begin calculating a prisoner's release date after his conviction. Defendants also knew that some prisoners would be entitled to immediate release upon conviction. Therefore, in cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetentions. Despite this awareness, years after the Lean Six Sigma project, Defendants have not pointed to a single effort that

21

any of them took to identify immediate releases more quickly during that month-long delay. And this is despite the fact that LeBlanc and Stagg were responsible for the Basic Jail Guidelines, while Stagg and Griffin were responsible for running DPSC's Pre-Classification Department. They were each in a position to adopt policies that would address this delay.

*Id.*

There, as here, Defendants urged that they should be "insulated from liability" because Lean Six Sigma study was irrelevant to showing any deliberate indifference there because it "was aimed at investigating DPSC's internal—not external—delays in processing prisoner paperwork." *Id.* The Fifth Circuit responded: "But this misses the point; Defendants cannot avoid the evidence that the study exposed unlawful detentions of prisoners. A reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference." *Id.* at 187–88.

The Fifth Circuit also found that defendants were not entitled to qualified immunity. The appellate court explained:

> This Court has recognized the "clearly established right to timely release from prison." Of course, "timely release" is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge. [*See Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (concluding that a jailer does not commit "an instant tort at the moment" the prisoner is entitled to release; instead, a jailer's "duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained.").] While courts have declined to define the amount of delay that is reasonable, [(citation omitted)], it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process. [*Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").] Indeed, Defendants knew not just of delay, but that there was, on average, a month-long delay in receiving paperwork from the local jails. Therefore, they had "fair

> warning" that their failure to address this delay would deny prisoners like Plaintiffs their immediate or near-immediate release upon conviction. We conclude that because a reasonable jury may find that Defendants' inaction was objectively unreasonable in light of this clearly established law, they have failed to show they are entitled to qualified immunity on these claims.

*Id.* at 188 (some citations omitted). The Court later continued:

> [T]here is a clearly established right to a timely release from prison, which "establishes that a jailer has a duty to ensure that inmates are timely released from prison." Due to the mothers' phone calls, Defendants knew that Crittindon and Burse were at risk of overdetention. Nonetheless, despite their knowledge that the two had been illegally held for three months, for 17 days they failed to address this risk. They had "fair warning" that their failure to address this delay would result in the illegal detention of Crittindon and Burse. Because a factfinder may find that Defendants' inaction in response to the risk of overdetention was objectively unreasonable in light of this clearly established law, Defendants have failed to show they are entitled to qualified immunity on these claims.

*Id.* at 189–90.

Lastly, the *Crittindon* majority rejected the dissent's view that the claims were barred by *Heck*. *Id.* at 190. In doing so, they highlighted how the Defendants "did nothing for 17 days" and how, after finally "'pick[ing] up the phone,' Plaintiffs were released within 24 hours." *Id.* Equally important, the Fifth Circuit stated, "This Court recognizes that overdetention by thirty days is a per se deprivation of due process." *Id.* at 191 (citing *Douthit*, 619 F.2d at 532).

### c. Parker v. LeBlanc

Subsequent cases only reenforced *Crittindon*. In July of 2023, in *Parker v. LeBlanc*, the Fifth Circuit affirmed undersigned's ruling that Plaintiffs adequately pled that LeBlanc was subject to supervisor liability and that he was not entitled to qualified immunity. 73 F.4th 400. There, Plaintiff relied upon three pieces of evidence to support a pattern of similar constitutional violations:

> (1) an October 2017 legislative audit report on the Louisiana DPSC
> entitled "CFE Management of Offender Data: Processes for
> Ensuring Accuracy Department of Corrections"; (2) a 2018 editorial
> by Senator John Kennedy and Attorney General Landry entitled,
> "Criminal Justice Reform Actually Hurting Public Safety,"
> published in the newspaper "The Advocate"; and (3) testimony by
> DPSC employees admitting to rampant over-detention in a similar
> suit in Louisiana state court, *Chowns v. LeBlanc*, La. 37th JDC 26-
> 932. Parker also alleges on information and belief that Defendant
> LeBlanc was aware of the three items we just enumerated.

*Id.* at 405. "LeBlanc insist[ed] that there [wa]s a meaningful distinction between Parker's over-

detention due to his alleged misclassification as a sex offender, as opposed to over-detention due

to miscalculations of his sentence or his status being generally lost in the system." *Id.* But the Fifth

Circuit "agree[d] with the district court's assessment":

> The district court "decline[d] to draw the line as finely as LeBlanc
> advances and limit the types of problems involved solely to those
> instances where individuals have been misclassified as sexual
> offenders." The court noted that the real problem alleged in the
> Legislative Audit report was the Department "not knowing when
> [inmates'] proper release date was" and that "inmate sentences have
> been 'done wrong'" as stated in testimony from *Chowns v. LeBlanc*.

*Id.*

The Fifth Circuit also relied on *Crittindon*: "The allegations in the complaint are that there

is a 'pattern of over-detention' that renders Parker's own case 'neither unique nor even unusual.'"

*Id.* at 406. "Parker has alleged that he was detained for 337 days past his release date and has cited

three pieces of evidence to support his allegations that LeBlanc was aware of the deficiencies of

implemented policies that routinely led to errors like the one that violated his constitutional rights."

*Id.* The Fifth Circuit went on to find that, under *Crittindon*, Plaintiff's right was clearly established,

and "defining the clearly established right as 'timely release from prison" was not "overbroad."

*Id.* at 408. Based on the allegations of the complaint, and under *Crittindon*, LeBlanc had "'fair

24

warning' that [his] failure to address this delay would deny prisoners like [Parker] their immediate or near-immediate release upon conviction." *Id.* (quoting *Crittindon*, 37 F.4th at 188).

d. *Hicks II*

In September 2023, the Fifth Circuit yet again found that a prisoner stated a viable claim against LeBlanc for overdention. *Hicks II*, 81 F.4th 497. The Court began its opinion: "We are seeing with some frequency claims of 'overdetention,' now a euphemism for prisoners illegally incarcerated beyond the terms of their sentence. Unfortunately, many of these cases have come to this Court in recent years. This is yet another from Louisiana." *Id*. at 500. The Court provided the same foundational law as above:

> The Fourteenth Amendment guarantees that no state may "deprive any person of life, liberty, or property, without due process of law." [U.S. Const. amend. XIV. § 1.] Clear as day, the government cannot hold an inmate without the legal authority to do so, for that would "deprive" a person of his "liberty . . . without due process of law." [*Id.*] Applying this foundational concept to carceral sentences and releases, it is clearly established that inmates have the right to timely release from prison consistent with the terms of their sentences, a holding we have long-held and repeatedly reaffirmed. [*See Parker*, 73 F.4th at 408 ("We agree that there is sufficient clearly established law regarding the constitutional right to a timely release from prison."); *Crittindon*, 37 F.4th at 188 (noting that the Fifth Circuit "has recognized the clearly established right to timely release from prison"); *see also Porter*, 659 F.3d at 445 ("Our precedent establishes that a jailer has a duty to ensure that inmates are timely released from prison."); [*Douthit*, 619 F.2d at 532] ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").] Relevant here, the right to timely release was clearly established well before 2017.

*Id.* at 504. The Court ultimately concluded:

> "There isn't always an explanation for everything." [Ernest Hemingway, A FAREWELL TO ARMS 81 (1929).]. Indeed, as our Court remains plagued by claims arising from inexplicable and illegal overdetention in Louisiana prisons, explanations scarcely arise, let alone satisfy scrutiny upon our review. [*See Crittindon*, 37

F.4th at 183.] The problem is endemic in Louisiana, where the process for calculating release dates is so flawed (to put it kindly) that roughly one in four inmates released will have been locked up past their release dates—for a collective total of 3,000-plus years. [Mariah Timms, *Louisiana Prisons Hold Inmates Past Their Release Dates, Justice Department Finds*, WALL ST. J. (Jan. 25, 2023); Kanishka Singh, *U.S. finds Louisiana deliberately kept inmates past release date*, REUTERS (Jan. 25, 2023); Lea Skene & Jacqueline DeRoberts, *State corrections overdetention woes, known since 2012, cost state millions, lawyer alleges*, THE ADVOCATE (Feb. 6, 2020).]

*Id.* at 510.

### e.  <u>*McNeal v. LeBlanc*</u>

Perhaps most relevant for present purposes, LeBlanc appealed this Court's denial of his motion to dismiss premised on qualified immunity. *McNeal*, 90 F.4th at 428. The Fifth Circuit summarized the relevant allegations against LeBlanc as follows:

McNeal alleges that, in 2012, DPSC performed an internal review called the "Lean Six Sigma," examining how long it took to calculate prisoner release dates. The review was "champion[ed]" by LeBlanc, who had been DPSC Secretary since 2008. Lean Six Sigma "found a widespread pattern of people being held past their legal release date," with 83% of DPSC prisoners being overdetained. The review determined that, on average, inmates were held 71.69 days past their release dates. After learning of the issue, LeBlanc set the goal to detain "450 persons per year, for an average of 31 days per person." LeBlanc's changes reduced the number of overdetained persons from "2,252 per year to 1,612, and the average number of overdue days was reduced from 71.7 to 60.52 days." Despite these efforts, LeBlanc conceded that "the 'functional processes' around the transmission of documents" at the DPSC "remain as antiquated as they were in 1996."

Even after the Lean Six Sigma review, overdetention issues persisted. For example, four DPSC employees testified in a 2015 state case, Chowns v. LeBlanc, La. 37th JDC 26-932, that DPSC employees were well aware of prisoner overdetention. In 2017, a report by the Louisiana Legislative Auditor documented DPSC's problems calculating and processing prisoners' release dates. DPSC itself conducted an internal review, which "confirmed that the pattern of overdetention it learned about in 2012" from Lean Six

26

Sigma "was ongoing." In a grant application to the U.S. Department of Justice, DPSC disclosed that in 2017 it "had an average of 200 cases per month considered an 'immediate release' due to [processing] deficiencies," and the prisoners in these cases "were held an 'average of 49 days past the end of their sentences.'" In 2018, then-Louisiana Attorney General Jeff Landry wrote an op-ed with U.S. Senator John Kennedy, stating there was "a layer of incompetence so deep that the Corrections Department doesn't know where a prisoner is on any given day of the week or when he should actually be released from prison."

McNeal further alleges that LeBlanc knew overdetention issues still plagued the DPSC as of November 2017. Specifically, after Lean Six Sigma, LeBlanc learned that thousands of people in the custody of DPSC "were being held past their release date." LeBlanc also admitted that, even after the changes he instituted, the DPSC "still had 'people being held an average of about two months past their release date.'" Yet, LeBlanc never fired, demoted, penalized, or reprimanded anyone for holding inmates past their release dates. Between 2012 and 2017, multiple officials reached out to LeBlanc about overdetained prisoners. LeBlanc was also personally involved in "the back-and forth with the auditor," which eventually led to the 2017 Louisiana Legislative Audit.

*Id.* at 429–430.

The Fifth Circuit affirmed this Court's denial of qualified immunity. *Id.* at 433. The Court began by quickly finding that, "[f]ollowing [the circuit's] recent caselaw, [the appellate court was] bound to agree with McNeal" that Plaintiff's claims were not barred by *Heck*. *Id.* at 430–31.

LeBlanc also argued that "McNeal fail[ed] to allege a pattern of similar overdetentions at DPSC." *Id*. at 431. But the Fifth Circuit rejected this argument as well:

We have already addressed this argument based on almost identical allegations made in *Parker* . . . . We held there, as we are bound to hold here, that the overdetained prisoner alleged a pattern of similar violations at the DPSC sufficient to deny LeBlanc qualified immunity at the motion to dismiss stage. *See* [73 F.4th] at 406.

*Id.*

The Fifth Circuit then turned to the Fourteenth Amendment standard, again reiterating:

> Our precedent establishes, accordingly, "that a jailer has a duty to ensure that inmates are timely released from prison." *Porter*, 659 F.3d at 445. Relevant to LeBlanc's liability, we recently "held that 'it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process.' " *Parker*, 73 F.4th at 404 (quoting *Crittindon*, 37 F.4th at 188); *see also* [*Douthit*, 619 F.2d at 532] ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

*Id.* at 431. The *Parker* court "held that LeBlanc's knowledge of three facts put him on notice of 'a pattern of similar constitutional violations by untrained employees'":

> (1) an October 2017 legislative audit report on the Louisiana DPSC entitled "CFE Management of Offender Data: Processes for Ensuring Accuracy Department of Corrections"; (2) a 2018 editorial by Senator John Kennedy and Attorney General Landry entitled, "Criminal Justice Reform Actually Hurting Public Safety," published in the newspaper "The Advocate"; and (3) testimony by DPSC employees admitting to rampant over-detention in a similar suit in Louisiana state court, Chowns v. LeBlanc, La. 37th JDC 26-932.

*Id.* at 432 (quoting *Parker*, 73 F.4th at 405). "Relying on *Crittindon*, [*Parker*] held these allegations demonstrated LeBlanc's notice of a pattern of similar overdetentions to survive prong one of qualified immunity at the motion to dismiss stage." *Id.* (citing *Parker*, 73 F.4th at 405).

*McNeal* then concluded:

> We are faced with two of the same relevant factual allegations made in *Parker*, and more. Like the plaintiff there, McNeal alleges that LeBlanc knew about the October 2017 legislative audit and testimony by DPSC employees in *Chowns v. LeBlanc*, La. 37th JDC 26-932, admitting to rampant overdetention. McNeal also alleges LeBlanc had intimate knowledge about the results from the Lean Six Sigma report before McNeal's overdetention occurred. Finally, McNeal alleges that before 2017, multiple public officials reached out to LeBlanc regarding overdetained prisoners. The *Parker* panel found fewer allegations sufficient to establish LeBlanc's knowledge of a pattern of overdetention. We are thus bound under the rule of orderliness to find McNeal's more numerous allegations sufficient

28

> to show deliberate indifference and to survive prong one of qualified immunity. *See ibid.*; *see also United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014).

*Id.*

The Fifth Circuit also found that, under *Parker*, the second prong of qualified immunity was satisfied:

> McNeal's alleged overdetention occurred in the fall of 2017, the same period the overdetention occurred in *Parker*. As in *Parker*, LeBlanc at that point had "fair warning that his failure to address" rampant overdetention in the DPSC "would deny prisoners like [McNeal] their immediate or near-immediate release upon conviction." [73 F.4th at 408] (cleaned up) (quoting *Crittindon*, 37 F.4th at 188).

*Id.* at 433. Thus, this Court's decision was affirmed. *Id.* Though two judges concurred and called for en banc reconsideration of *Crittendon*, *id.* at 435 (Jones, J, concurring), 439 (Duncan, J., concurring), the Fifth Circuit denied such rehearing, 93 F.4th 840 (5th Cir. 2024), and the Supreme Court denied certiorari, 2024 WL 4427170.

### f.  *Buccicchio v. LeBlanc*

After *McNeal*, the Fifth Circuit has continued to reject LeBlanc's appeals and has cited to increasing allegations supporting liability against LeBlanc. In October of 2024, in *Buchicchio*, the Fifth Circuit once again affirmed the denial of a motion to dismiss based on qualified immunity. 2024 WL 4603272, at *1. The Fifth Circuit explained:

> In support of his allegations, Buchicchio cited to (1) an October 2017 legislative audit report on the DPSC that found that the DPSC "process for calculating offender release dates is inconsistent, which can result in errors"; (2) the DPSC's own investigation showing that in 2017, there was "an average of 200 cases per month considered an 'immediate release' due to the[ ] deficiencies" in the process for calculating release dates; (3) an August 2018 Excel spreadsheet created by DPSC staffers indicating that on average, prisoners were overdetained 38.6 days; (4) LeBlanc's 2019 deposition testimony admitting that the fact that it could take up to twelve weeks to

calculate an offender's release date was "ridiculous" and "something we need to address"; (5) testimony by numerous DPSC employees in a similar suit in state court (*Chowns v. LeBlanc*, 37th Judicial District Court ("JDC") of Louisiana, No. 26-932) describing consistent overdetention; (6) a 2018 editorial opinion written by United States Senator John Kennedy and Attorney General Jeff Landry, describing the "incompetence" of DPSC; (7) a February 2019 letter to LeBlanc from Judge Edwards of Louisiana's 15th JDC informing him about a specific case of overdetention and adding that "defense attorneys in Lafayette are also complaining about the failure to timely release inmates"; and (8) 2022 deposition testimony by LeBlanc admitting that "there's not a system in place to get [prisoners eligible for immediate release upon sentencing] quickly released."

In this Court's recent decision in *Parker v. LeBlanc*, the plaintiff cited to three of the above documents, [734 F.4th at 405,] specifically the 2017 legislative audit report, the 2018 editorial, and the testimony by DPSC employees in *Chowns v. LeBlanc.* This Court held that those three documents "supported [Plaintiff's] allegations that LeBlanc was aware of the deficiencies of implemented policies that routinely led to error like the one that violated his constitutional rights." [*Id.* at 406.] In this case, Buchicchio has cited to even more evidence supporting the requisite "pattern" of constitutional violations by untrained employees to establish deliberate indifference for purposes of supervisory liability. Accepting all of his "well-pleaded facts as true" and viewing them "in the light most favorable to [him]," Buchicchio's complaint meets the facial plausibility standard under Rule 12(b)(6) for stating a clam of supervisory liability against LeBlanc. [*Id.* (citation omitted).]

*Id.* at *3. The appellate court also rejected LeBlanc's efforts to distinguish the case:

As he has done in prior overdetention cases, LeBlanc argues that Buchicchio has not pleaded facts establishing a pattern of "very similar" constitutional violations and that his allegations are "too general" to support deliberate indifference in this case. We have rejected these arguments, holding that "[t]he standard for deliberate indifference requires only a 'pattern of *similar* constitutional violations by untrained employees' rather than an exact duplication." [*Parker*, 73 F.4th at 406 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see McNeal*, 90 F.4th at 432.'

*Id.* at *4. The Fifth Circuit further found no abuse of discretion in the district court taking judicial notice of the DOJ report "followed a two-year investigation into DPSC's time-computation and release practices and detailed 'multiple policy failures resulting in overdetention at DPSC,' including failure to adopt appropriate polices and time-computation processes, as well as failure to train" and which "described the unconstitutional overdetentions as 'severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in [DPSC]'s policies and practices.'" *Id*. Based on all of this, the circuit court held that "Buchicchio's allegations are sufficient to survive LeBlanc's assertion of qualified immunity at the motion to dismiss stage." *Id.*

### C. Analysis

Having carefully considered the matter, both motions will be denied. At the outset, most of Defendants' arguments are easily dispensed with in light of the above cases.

First, Defendants contend that, because this case involves "sanctions" for Act 402 probation revocations rather than Pre-Classification Department sentencing errors, there is no pattern of similar violations, but the Court rejects this position for several reasons. For one, Defendants' position is contrary to the plain language of the statute in question, which provides that such probation revocations carry a "sentence." *See* La. Code Crim. Pro. art. 900(b), (c).[3] Second, it conflicts with the testimony of DOC employees, including Defendant Collins, that

---

[3] This statute provides in relevant part:

> [A]ny defendant who has been placed on probation by the court for the conviction of an offense other than a crime of violence as defined in R.S. 14:2(B) or of a sex offense as defined by R.S. 15:541, and who has been determined by the court to have committed a technical violation of his probation, may be required to serve a <u>sentence</u> of not more than ninety days without diminution of sentence. . . . Upon completion of the imposed <u>sentence</u> for the technical revocation, the defendant shall return to active and supervised probation for a period equal to the remainder of the original period of probation subject to any additional conditions imposed by the court. . . .

La. Code Crim. Proc. Ann. art. 900(b–c) (emphasis added).

Plaintiff was "sentenced."[4] Third, even putting the first two points aside, this Court "declines to draw the line as finely as LeBlanc advances and limit the types of problems involved solely to those instances where individuals" are overdetained as part of revocations. *Parker*, 73 F.4th at 405. Again, "[t]he standard for deliberate indifference requires only a 'pattern of *similar* constitutional violations by untrained employees' rather than an exact duplication." *Buchicchio*, 2024 WL 4603272, at *4. Indeed, the Fifth Circuit rejected this argument in *McNeal*, 90 F.4th at 431, and this Court does so again.

Second, Defendants are simply wrong that there is no per se rule for thirty-day overdetentions and that this principle was not clearly established law. The Fifth Circuit could not be clearer: "it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process." *Parker*, 73 F.4th at 404 (quoting *Crittindon*, 37 F.4th at 188); *see also Douthit*, 619 F.2d at 532 (same). All of these cases also show (1) that the Fifth Circuit looks to its own cases to determine what constitutes clearly established law, *see Parker*, 73 F.4th at 407 (quoting *Crittindon*, 37 F.4th at 186); and (2) that, under this precedent, the above principle was clearly established law at the time of McNeal's overdetention. *See Parker*, 73 F.4th at 406–08 (quoting *Crittindon*, 37 F.4th at 188); *Hicks II*, 81 F.4th at 50; *Douthit*, 619 F.2d at 532. Indeed, that is exactly what the Fifth Circuit said *in this case. McNeal*, 90 F.4th at 431, 433. Defendants' arguments to the contrary are borderline frivolous.

Additionally, one of Plaintiff's arguments can be dispensed with easily—namely that the doctrine of qualified immunity should be rejected completely. As undersigned has said before, "this Court's own feelings toward qualified immunity are ultimately irrelevant; Plaintiffs'

---

[4] (*See* Collins Dep. 24, Doc. 140-6 ("Q. So this document reflects that a judge ordered that Mr. McNeal was to serve a 90-day sentence at the Steve Hoyle Program, correct? A. Yes."); Ellis Dep. 9, Doc. 140-7 ("Q. So on August 3rd, 2017, Brian McNeal was sentenced to a 90-day sentence at the Steve Hoyle [P]rogram, correct? A. Yes.").)

arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court." *Clark v. Hotard*, No. 22-326, 2024 WL 3566695, at *4 (M.D. La. July 29, 2024) (deGravelles, J.) (citations omitted); *see also Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) ("If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (cleaned up)).

Thus, the Court turns to the heart of the matter: did LeBlanc institute widespread practices which amounted to *de facto* policies, which were allowed to exist because of his deliberate indifference, and which were the driving force behind McNeal's overdetention? Having carefully considered the matter, the Court finds that there are genuine issues of material fact precluding total summary judgment in favor of either party.

*DMSJ* easily fails for a number of reasons. Again, the Fifth Circuit explained in this case:

> We are faced with two of the same relevant factual allegations made in *Parker*, and more. Like the plaintiff there, McNeal alleges that LeBlanc knew about the October 2017 legislative audit and testimony by DPSC employees in *Chowns v. LeBlanc*, La. 37th JDC 26-932, admitting to rampant overdetention. McNeal also alleges LeBlanc had intimate knowledge about the results from the Lean Six Sigma report before McNeal's overdetention occurred. Finally, McNeal alleges that before 2017, multiple public officials reached out to LeBlanc regarding overdetained prisoners.

*McNeal*, 90 F.4th at 432. Plaintiff has submitted considerable evidence supporting each of these allegations.[5] Thus, just as the Fifth Circuit found that it was "bound" by *Parker* "to find McNeal's

---

[5] (*See* LeBlanc Dep. 61–62, Doc. 140-9 (testifying that he saw the Legislative Auditor report when it came out and was "part of the back-and-forth" with the auditor providing information); DiBendetto Dep. 12, Doc. 140-24 (testifying in the *Chowns* case that, from around 2000 to 2009, DOC found "at least one inmate" per week through the inmate grievance system who was "eligible for immediately release"); *id.* at 20 (testifying that the second most common reason for "immediate release" was that "the inmate had not been given proper jail credit); Goines Dep. 54–55, Doc. 140-25 (stating in *Chowns* that it would generally come up "one or two [times] a week" that there would be an inmate who is eligible for immediate release," which could be found for "several reasons," including that the "sheriff sen[t] in some additional information regarding the credit he's entitled to"); Riddick Dep. 33–34, Doc. 140-26 (testifying

more numerous allegations sufficient to show deliberate indifference and to survive prong one of qualified immunity," *id.* (citations omitted), so too does this Court find that the evidence highlighted by Plaintiff, when construed in a light most favorable to him and with reasonable inferences drawn in his favor, demonstrate deliberate indifference to the policies which led to the overdetention crisis generally and McNeal's overdetention in particular. *See id.*; *see also Crittindon*, 37 F.4th at 187–88 (affirming denial of summary judgment based in large part on the Lean Six Sigma study, explaining, "Defendants cannot avoid the evidence that the study exposed unlawful detentions of prisoners. A reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference.").

Even putting these issues aside, Plaintiff has submitted a mountain of other evidence supporting the conclusion that LeBlanc acted with deliberate indifference to the de facto policy of overdetention. The Court need not summarize all of the facts highlighted by the Plaintiff in briefing. (*see* Doc. 140 at 4–11.) But, the Court does find it important to emphasize some to demonstrate the severity of the problem.

By late 2012, even after the Six Sigma Interventions, LeBlanc knew that DOC still had "people being held an average of about two months past their release date." (LeBlanc Dep. 45, Doc. 140-9.) No one got fired, demoted, or reprimanded, and no one received a dock in pay. (*Id.*

---

that DOC was so back logged that a person could be "sentenced in November and she just didn't get to it until August"); *id.* at 78 (stating that, given "the amount of cases," "there [were] times [she] would be stacked up knee deep high backlogged"); *id.* at 90 (Q. "Did you ever find a time when you looked at an inmate's record and say, this man should be out now?" A. "Oh, yes."); LeBlanc Dep. 28–48, Doc. 140-9 (testifying that he learned about the problem with people being held past their release dates through the 2012 Lean Six Sigma study, which he has read through and which listed him as a "champion" of, and discussing its development and findings, including that "thousands of people in the custody of the [DOC] for whatever reason were being held past their release date. . . ."); *Humphrey/Giroir* Tr. 40, Doc. 140-17 (LeBlanc stating that he reviewed the findings of the Lean Six project); Doc. 140-14 (2015 and 2016 emails from state legislative assistant and state district judge to LeBlanc concerning complaints of overdetention issue); Doc. 140-4 at 1, 10 (2017 email from state supreme court official regarding same).

at 48–49.) So, the Six Sigma investigation found a lot of overdetention as a baseline, "and with some tinkering modestly improved that overdetention . . . [b]ut there was still a lot of overdetention even after the interventions of the Six Sigma process." (Whittaker Dep. 33, Doc. 140-3.)

Yet, the problem was not solved; in fact, as of September 2018, DOC's website stated, "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date," (Doc. 140-15 at 3.) LeBlanc testified, "12 weeks is ridiculous," "something we need to address," and "just absurd." (LeBlanc Dep. 89–90, Doc. 140-9.) There was also a statement on DOC's voicemail system that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve their sentence, which was not taken down until around March 2019. (DOC 30(b)(6) Dep. 12–13, Doc. 140-10.) DOC testified: "Q. [The purpose was to] tell people's families, to tell inmates' families, hey, it may take months for an inmate's time to get computed after their sentence, so you don't need to call us about it, right? A. Giving them parameters of how long it may take, yes." (*Id.* at 17–18.) And, again, from 2014-2016, the state received emails from state legislator's office and state judicial offices about the issue, as summarized above. (Doc. 140-14; Doc. 140-4.) All of this evidence was cited by *Buchicchio*, 2024 WL 4603272, at *3, to support the Fifth Circuit's denial of qualified immunity at the motion to dismiss phase, and the evidence provided by Plaintiff here supports a similar finding at the summary judgment stage.

Additionally, in 2016, LeBlanc went to Debbit Hudnall, the Executive Director of the Louisiana Clerks of Court of Association, about how "the process of getting documents to the DOC is slow, and so people are being over-detained." (Hudnall Dep. 22, Doc. 140-18.) Hudnall suggested that (1) the DOC work to pass legislation that the clerk only had to prepare a Uniform

Commitment Order and the Bill of Information (rather than the minutes) and (2) the clerks could email the relevant documents "directly to the DOC." (*Id.* at 22–25.) DPSC accepted the first suggestion but rejected the second because, according to Hudnall, they said that they lacked the "capability to receive the documents via email" in that it "might cause more work for them" and "make [it] more difficult[.]" (*Id.* at 24–28) DOC chose this despite an October 7, 2016, letter from LeBlanc to Hudnall advising that, because of delayed paperwork problems, "We have found in these cases, an offender may serve an average of 40 additional days incarcerated." (Doc. 140-19.)

In a November 4, 2016, follow up email, LeBlanc told Hudnall that one of the outcomes of the meeting would be to "develop an action plan with [the Clerks'] and the Sheriffs' Offices in these areas to improve upon this turnaround time" and to "look at the feasibility of receiving the UCO and Bill of Information documents electronically. . . ." (Doc. 140-20.) But LeBlanc has yet to produce any document reflecting an action plan or feasibility study. (*See* Doc. 140-21 ("There are no responsive documents to your request to 'produce the "action plan" described at 589 and documents related to the "feasibility" study . . . .'").

2017 revealed evidence of further deliberate indifference. The Court already noted the evidence of LeBlanc's review of the 2017 Louisiana Legislative Auditor's report and his being "part of the back-and-forth with the auditor providing information." (LeBlanc Dep. 61, Doc. 140-9.) Among other findings, the report stated that the Legislative Auditor "sampled 100 offender files at nine local facilities and one state facility and found that 19 offender files had errors in CAJUN . . . These 19 offender files had a total of 26 errors." (Doc. 140-12 at 10 & n.5.) Likewise, the DOC's own investigation resulted in a disclosure in a 2017 grant application that it "had an average of 200 cases per month considered an 'immediate release' due to these deficiencies." (Doc. 140-16 at 4.) Both *McNeal*, 90 F.4th at 432, and *Buchicchio*, 2024 WL 4603272, at *3, cited the

Legislative Audit Report and this grant application in support of its decision that a viable claim was stated against LeBlanc. As stated above, the same result is warranted here.

Plaintiff also highlights that LeBlanc identified one option DOC could pursue in the future to mitigate the problem: have DOC actually go out and get the paperwork. (LeBlanc Dep. 80, 100–01 Doc. 140-9.) But that was not tried in the past. (*Id.*) Another option was to put a time frame for the sheriffs to submit Pre-Classification documents, but that was not tried as of 2019, even though there was no reason not to. (*Humphrey/Giroir* Tr. 60, Doc. 140-17.) In fact, LeBlanc did not sign a version of the Basic Jail Guidelines that had a timeline for sheriffs until 2023—years after McNeal's overdetention. (*Id.* at 60–61.)

The DOC also issues a strategic plan about every five years, and, prior to 2019, that plan said nothing about reducing, mitigating, or eliminating the problem of people being held past their release date. (*Id.* at 53.) In fact, in July 2019, LeBlanc promised at a deposition that the next strategic plan would address this issue, but the first time it was added was not the September 2019 plan but the one for Financial Year 2023. (*Id.* at 53–56.) And that strategy is to continue doing what the DOC is doing. (*Id.* at 56.)

In sum, the Court finds that, when construing the evidence highlighted above in a light most favorable to Plaintiff and when drawing reasonable inferences in his favor, and when viewing this evidence in the context of Fifth Circuit caselaw from *Crittindon* to *McNeal* to *Buccicchio*, Plaintiff has shown more than sufficient evidence from which a reasonable jury could conclude that LeBlanc implemented and failed to implement policies with deliberate indifference which directly caused the overdetention crisis generally and McNeal's overdetention in particular. As a result, *DMSJ* is easily denied.

A much harder question with which this Court has struggled is whether to grant *PMPSJ*. Certain parts of Plaintiff's syllogism have been established:

(1) As this Court previously held, there is no genuine issue of material fact that McNeal was imprisoned for 41 days following his correct release date. (Doc. 56 at 14.)

(2) Overdetention beyond 30 days is a per se violation of the Fourteenth Amendment. *See McNeal, 90 F.4th at* 431 (citing *Parker*, 73 F.4th at 406–08 (quoting *Crittindon*, 37 F.4th at 188); and then citing *Douthit*, 619 F.2d at 532).

(3) The Fifth Circuit held that "LeBlanc has a duty to ensure inmates are timely released from prison." *Parker*, 73 F.4th at 407.

But, the main question is: does that make LeBlanc as jailor automatically liable?

The Court finds that it does not. The quote from *Parker* about LeBlanc's duty came in the context of whether the right was clearly established, the second prong in the qualified immunity analysis. *See id*. But, under *Crittindon*, Plaintiff must show deliberate indifference to establish LeBlanc's liability under the first prong of the qualified immunity analysis. 37 F.4th at 186–88. Here, by the slimmest of reeds, there is conflicting evidence on this point.

As amply demonstrated above, there is considerable evidence of LeBlanc's culpability; but, interspersed with that evidence, there are facts from which a reasonable juror could conclude that LeBlanc was *not* deliberately indifferent. For example, the Clerks of Court Association made two suggestions to LeBlanc, one of which he disregarded. (Hudnall Dep. 22–25, Doc. 140-18.) But Hudnall acknowledged that LeBlanc implemented one of those: having the DOC work to pass legislation that the clerk only had to prepare a Uniform Commitment Order and the Bill of Information (rather than the minutes). (*Id.* at 24–28.) LeBlanc explained further that they spent "many, many, many, many manhours reformatting the [UCO] to help us in that . . that be[ing] the document that we used to calculate time," though LeBlanc acknowledged that "no judge, nobody will use it." (LeBlanc Dep. 77–78, Doc. 140-9.)

Moreover, the Six Sigma investigation found a lot of overdetention as a baseline and even after interventions of the process, but "with some tinkering modestly improved that overdetention." (Whittaker Dep. 33, Doc. 140-3). LeBlanc elaborated on the response to the Lean Six Sigma study. He testified that he implemented some recommendations from the study and that "things got better . . . but . . . it wasn't a cure-all in the recommendations obviously." (LeBlanc Dep. 53–54, Doc. 138-5.) LeBlanc explained that they "still were having paperwork problems and getting the paperwork in a timely fashion, and that's when we began . . . with the Felony Class Task Force, . . . trying to fix the problem." (*Id.*) LeBlanc referenced "the effort to replace CAJUN with a new computer system around 2015," which was a "modernization project, which [they] haven't gotten off the ground" but which will "hopefully . . . help us get to where we need to be." (*Id.* at 53–54.) Around "2015, a couple of million dollars was spent to get a new computer system to replace CAJUN." (*Id* at 54.) But, "the new computer system didn't work, and so the Department went back to CAJUN[.]" (*Id.*)

Plaintiff certainly presents counter evidence; he points out that "DPSC did not build an online portal to accept records electronically until 2023." (*Humphrey/Giroir* Tr. 169, 183, Doc. 140-17.) The initial attempt "was not a success" and "never went into full production." (Ellis Dep. 22, Doc. 140-10.) "It was tested for a bit[,] . . . then found to be inoperable[,] . . . and shut down almost immediately." (*Id.*) Thus, in 2019 (the time of McNeal's overdetention), the functional processes of the agreement between DOC and the sheriffs—that is, the utilization of CAJUN and the process in which the information was provided to DOC from the sheriff—remained as antiquated as they were in 1996. (*Id.* at 28–30.)

Again, "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Davis ex rel. McCully*,

39

406 F.3d at 381 (cleaned up). "Deliberate indifference requires a showing of more than negligence or even gross negligence." *Id.* (citation omitted). " 'Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.' " *Id.* (quoting *Alton*, 168 F.3d at 201).

While an extremely close call, the Court finds that, when construing the evidence in a light most favorable to *LeBlanc* and drawing reasonable inferences in his favor, a reasonable juror could conclude that LeBlanc's conduct was grossly negligent but, given the few and relatively inconsequential actions he did take, did not rise to the level of disregarding a known or obvious consequences of his action. In short, genuine issues of material fact preclude summary judgment in favor of either party. As a result, the *PMPSJ* is also denied.

## IV. DISCUSSION: STATE LAW CLAIMS

### A. Parties' Arguments

Defendants next argue that the state law claims should be dismissed. (Doc. 138-1 at 21.) First, Plaintiff admits to attacking LeBlanc's policies and training, but Louisiana law bars liability for policymaking and discretionary acts. (*Id.*)

Second, Plaintiff presents no evidence to support his negligence claim against Collins. (*Id.*) This is because (1) Collins has no duty to calculate Plaintiff's time correctly as an Act 402 revocation; (2) if she had a duty, she did not breach it since she sent the release letter to the court-ordered facility; and (3) she played no role other than sending the letter to Hoyle, so "it was not foreseeable that (a) McNeal would not be accepted into Hoyle, (b) McNeal's letter would not later be transferred to [Elayn] Hunt, and (c) McNeal would be kept at [Elayn] Hunt beyond November 1." (*Id.* at 21–22.)

Plaintiff responds that LeBlanc is not entitled to immunity under R.S. 9:2798.1. (Doc. 140 at 12.) That statute requires a two-step analysis, asking whether the official violated a rule prescribing a mandatory course of conduct and, if not, whether the discretionary act related to public policy considerations. (*Id.* at 12–13.) But LeBlanc fails that test because he is under a mandatory duty to ensure the timely release of inmates. (*Id.* at 13.) LeBlanc tried the same argument in state court in *Chowns v. LeBlanc*, 26,932 (37th JDC). (*Id.*) Moreover, no privilege can allow a jailer to detain a prisoner beyond the end of his lawful sentence. (*Id*)

Plaintiff then argues that Collins was negligent because "(1) Collins was aware that she sent the release letter to a facility McNeal never wound up at; and (2) it was <u>her</u> job to avoid that problem." (*Id.* at 14.) Plaintiff points to certain testimony supporting both of these points. (*Id.* at 14–16.)

Defendants reply that Plaintiff fails to create a question of fact on negligence. (Doc. 141 at 9.) Plaintiff's entire § 1983 claim is based on LeBlanc's policymaking decisions, so he is likewise entitled discretionary immunity under state law. (*Id*. at 9–10.)

### B.  Law and Analysis

Having carefully considered the matter, the Court will deny the *DMSJ* on this issue. La. R.S. § 2798.1 provides in relevant part:

> B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
>
> C. The provisions of Subsection B of this Section are not applicable:
>
> > (1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

> (2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

"The list in paragraph (C)(2) of La. R.S. 9:2798.1 . . . connotes conduct more severe than negligent behavior. Recklessness is, in effect, 'gross negligence.'" *Mariana v. Magnolia Auto Transp., LLC*, 21-447 (La. App. 5 Cir. 5/26/22), 341 So. 3d 1281, 1291.

> Only the most egregious conduct by parish agents, employees, or representatives that exhibits an active desire to cause harm, or a callous indifference to the risk of potential harm from flagrantly bad conduct, will rise to the level of "willful misconduct" or "criminal, willful, outrageous, reckless, or flagrant misconduct" resulting in a forfeiture of all the immunity protections afforded by the discretionary immunity statute.

*Id.* (citing *Haab v. E. Bank Consol. Special Serv. Fire Prot. Dist. of Jefferson Par.*, 13-954 (La. App. 5 Cir. 5/28/14), 139 So.3d 1174, 1182).

Under this standard, LeBlanc's claim for immunity easily fails. The Court has already found that a reasonable jury could conclude that LeBlanc acted with deliberate indifference, and, for the same reasons, a reasonable jury could find that LeBlanc acted recklessly under La. R.S. 9:2798.1. *Cf. Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994) ("subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").[6] Thus, the *DMSJ* is denied as to Plaintiff's state law claims against LeBlanc.

---

[6] *See also Farmer*, 511 U.S. at 839 ("To be sure, the reasons for focusing on what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be), differ in the Eighth Amendment context from that of the criminal law. Here, a subjective approach isolates those who inflict punishment; there, it isolates those against whom punishment should be inflicted. But the result is the same: to act recklessly in either setting a person must "consciously disregar [d]" a substantial risk of serious harm." (quoting Model Penal Code § 2.02(2)(c))).

*DMSJ* is also denied as to Collins because there are genuine issues of material fact which preclude summary judgment. Preliminarily, "[t]he duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06), 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So. 2d. 318, 321). Under this analysis, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id.* at 633 (citing *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989), *reh'g granted on other grounds and original opinion reinstated as supplemented*, 556 So. 2d at 13 (La. 1990)). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Id.* (citing *Mathieu*, 646 So. 2d at 326).

Here, Collins was an investigative specialist with DOC. (Collins Dep. 17, Doc. 140-6). She testified that part of her job was "making sure that these custodial treatment programs have the paperwork that they need to know how long to hold an inmate for," and to "help to make sure that the inmate is paired with the place they're supposed to be and the paperwork that governs how that is to be managed." (*Id.* at 21.) She also said that "part of [her] job was to make sure the documents, including the release paperwork, made it to the facility that Mr. McNeal was to be imprisoned at[.]" (*Id.* at 30.)

As part of her job, on August 22, 2017, Collins sent a release letter to the "Steve Hoyle Program for Brian McNeal, because that is the facility that the judge said he was supposed to go

to[.]" (*Id.* at 27.) But Collins sent this even though she knew that, on that day, McNeal was physically in Orleans Parish Prison. (*Id.* at 32.)

Collins also knew that McNeal's transfer from prison to the Steve Hoyle Program was canceled by the Elayn Hunt medical department. (Doc. 138-10; Collins Dep. 36, Doc. 140-6; Ellis Dep. 28, Doc. 140-7.) The email stated, "advise of further instructions." (Doc. 138-10.) She knew that his paperwork was at one prison but that he was at another, and she admitted that "[i]t could be a problem." (Collins Dep. 36, Doc. 140-6.) Despite this, Collins failed to take any steps to remedy the problem. (*See* Ellis Dep. 29–30, Doc. 140-7 ("Q. And so your investigation today and any other day you have not been able to find any evidence that Brianca Collins took any steps after that September 5th e-mail to ensure that Mr. McNeal's Certificate of Release wound up in the facility he was actually at, correct? A. I don't see anything from her or anyone else, right.").)

As Plaintiff argues, "remedying that problem was <u>her</u> responsibility." (Doc. 140 at 15.) Again, a DPSC manager testified that the person responsible for making sure that this issue doesn't happen (i.e., that McNeal's Certificate of Release went to one place and he went to another) is whoever is responsible for his case file at Probation and Parole. (Milligan Dep. 40, Doc. 140-5.) That manager testified that the person handling McNeal's file was not "doing their job." (*Id.* at 40–41.) Collins was "the investigative specialist handling Mr. McNeal's case file." (Collins Dep. 30, Doc. 140-6.)

Considering all of this evidence, a reasonable jury could conclude that Collins had a duty to ensure McNeal's timely release, that she breached that duty, and that this breach caused McNeal harm. As a result, *DMSJ* is denied as to the state law claims against Collins.

## V.  DISCUSSION: *HECK* BAR

Lastly, Defendants argue that Plaintiff's claims are *Heck*-barred, but they acknowledge that "the Fifth Circuit recent decision in this case presently forecloses that outcome." (Doc. 138-1 at 22–23.) "Because this Court is presently bound to reject this *Preiser*/*Heck* argument, however, the State raises this argument only for preservation purposes." (*Id.* at 23.) Plaintiff writes at great length about how often this argument has been rejected and asks the Court to warn Defendants not to continue to advance frivolous arguments. (Doc. 140 at 16.) Defendants simply reply by footnote that, at the time of their writing, the issue remained pending before the Supreme Court. (Doc. 141 at 10.)

The Court need not spend a great deal of time on this. In *Crittindon*, this Court rejected the argument that overdetention claims are *Heck*-barred, 37 F.4th at 190, and the Fifth Circuit declined to take up the issue en banc in this case, *see McNeal*, 90 F.4th at 435, *reh'g denied*, 93 F.4th 840 (5th Cir. 2024). Defendants' position is again rejected by this Court, and they are cautioned to avoid making frivolous arguments.

## VI.  CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Plaintiff's Motion for Partial Summary Judgment on Fourteenth Amendment Claim* (Doc. 134) filed by Plaintiff Brian McNeal and the *Motion for Summary Judgment* (Doc. 138) filed by Defendants Louisiana Department of Public Safety and Corrections, Secretary James LeBlanc, and Breunkia Collins are **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>January 30, 2025</u>.

 

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

45